[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 3, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-12091
Non-Argument Calendar

_____

D. C. Docket No. 07-00329-CV-1-MEF
BKCY No. 06-010664-DHW

IN RE:

GLADYS H. YELVERTON,
ELIJAH J. YELVERTON,

Debtors.

_____

ARMY AVIATION CENTER FEDERAL CREDIT UNION,

Plaintiff-Appellant,

versus

ELIJAH J. YELVERTON,
GLADYS H. YELVERTON,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(November 3, 2008)**

Before HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

In this bankruptcy case, Army Aviation Center Federal Credit Union ("Army Aviation") claimed it had a secured interest in a 2000 Isuzu Rodeo ("the Rodeo") pledged by Gladys and Elijah J. Yelverton, the debtors. The bankruptcy court sustained the Yelvertons' objection to Army Aviation's claim. The district court affirmed, and Army Aviation appealed. After review, we vacate and remand.

## I. Background

### A. The March and July Agreements

This is a dispute about whether Army Aviation, a credit union, can apply the sale proceeds from collateral (the Rodeo) pledged by the Yelvertons under a July 2000 agreement to a debt arising under an earlier, March 2000 agreement.

Specifically, on March 31, 2000, Gladys Yelverton signed a Loan Application and Permanent Loan Agreement ("the March agreement") with Army Aviation. The March agreement was opened in Gladys's name only and was assigned account number XX871. The March agreement allowed Gladys to open one or more sub-accounts and created an "Open End Line of Credit" that permitted Gladys to borrow money subject to a credit limit imposed by Army Aviation.

On July 7, 2000, Gladys Yelverton signed another Loan Application and

Permanent Loan Agreement ("the July agreement") with Army Aviation. The July agreement was assigned account number XXXX270 and was opened in the names of Gladys Yelverton, Clifton D. Yelverton, and Elijah J. Yelverton as joint borrowers. The July agreement allowed the joint borrowers to open one or more sub-accounts.

The July agreement contained two clauses particularly relevant to this litigation. The future advance clause provided that Army Aviation's security interest extended to amounts the borrower owed <u>now</u> or in the future, stating:

> The Security Interest secures the advance and any extensions, renewals or refinancing of the advance. <u>It also secures any other advances you may have now</u> or may receive in the future under the Xpress Permanent Loan Agreement, <u>as well as</u>, <u>any other amounts you owe the Credit Union for any reason now</u> or in the future.

(Emphasis added.) The defeasance clause provided that Army Aviation's security interest was cancelled when any sub-account was repaid unless the borrower was in default on another sub-account, stating:

> When you repay <u>any sub-account</u> for which a security interest has been given, the security interest will be cancelled; except that if you are then in default on <u>any other sub-account</u>, we will maintain all security under this Agreement until you are no longer in default.

(Emphasis added.)

In addition, the July agreement explicitly incorporated provisions of other

3

agreements and explicitly limited some of the penalties for debts owed exclusively under the July agreement. The July agreement provided, "You also agree that all existing balances for any obligation you owe to [Army Aviation] may be incorporated within this Agreement . . . . [and] [t]hat collateral securing other loans with [Army Aviation] may also secure this loan." Elsewhere, the July agreement provided that "[a]ll terms of all other agreements are incorporated by reference herein." Finally, the July agreement provided that Army Aviation could demand finance charges when "you default on any sub-account under this Agreement." (Emphasis added.)

The July agreement also defined the term "You" and the relationship among the joint borrowers. The first page of the July agreement defined "You" as "Clifton D. Yelverton and E.J. Yelverton and Gladys H. Yelverton," and just below this definition, the agreement provided that "[b]y signing this Agreement, you, jointly and severally, agree to all terms and conditions hereunder." (Emphasis added.) This same page of the agreement later provided that "[y]ou agree to all of the terms stated on the front and back of this form and that all terms apply to you jointly and severally." (Emphasis added.)

Under the July agreement, Gladys Yelverton, along with the joint borrowers, opened a sub-account for an automobile loan in the amount of $22,883.67. The

joint borrowers agreed to pay $400.46 per month beginning on August 21, 2000, until they paid off the full amount. Also on July 7, 2000, the joint borrowers pledged the Rodeo as collateral for the $22,883.67. The joint borrowers made their monthly payments through July 3, 2006. Their next payment was due on July 21, 2006.

**B. The Chapter 13 Petition**

On July 10, 2006, Gladys and Elijah Yelverton filed a petition for relief under Chapter 13 of the United States Bankruptcy Code. On July 25, 2006, Army Aviation filed claim number five in the amount of $1,744.74, which was secured by the Rodeo. Claim number five arose under the July agreement. On December 1, 2006, the joint borrowers paid Army Aviation the $1,744.74 balance due on the automobile loan arising under the July agreement sub-account, closing that sub-account.

Also on July 25, 2006, Army Aviation filed claim number six in the amount of $4,528.94, which was due under the March agreement. Army Aviation claimed that claim number six was secured under the July agreement by the excess equity in the Rodeo, which it argued had been pledged towards the March debt through the "any other advances" language in the July agreement's future advance clause.

On September 8, 2006, the Yelvertons filed an objection to claim number

5

six, asserting that Army Aviation's claim for $4,528.94 under the March agreement was unsecured by the excess equity in the Rodeo because the Rodeo was pledged as part of the July agreement. After the Yelvertons filed for bankruptcy, Army Aviation received no payments on the debt of $4,528.94 due under the March agreement.

## C. Bankruptcy and District Court Proceedings

After an evidentiary hearing, the bankruptcy court determined that the undisputed value of the Rodeo was $8,600 and sustained the Yelvertons' objection to claim number six. Army Aviation argued that the future advance clause's language—that any security interest also secures "any other advances you may have now" and "any other amounts you owe"— expressed an intent to pledge the Rodeo as security for the debt owed under the March agreement. However, Alabama law recognizes future advance clauses only if the agreements at issue are "between the same parties."

The bankruptcy court determined that the March agreement and the July agreement were not between the same parties because the March agreement was signed only by Gladys Yelverton and the July agreement was signed by Gladys, Clifton, and E.J. Yelverton. After noting the July agreement provided that the Rodeo would secure "'any other amount you owe the Credit Union for any reason

now or in the future,'" the bankruptcy court emphasized that "[t]he pronoun 'you' in this contract refers to the three co-makers." The bankruptcy court determined that "there is no indication that the parties to the July [agreement] intended that the vehicle also secure the individual and separate obligations of any one of the co-makers." The bankruptcy court therefore characterized Army Aviation's $4,528.94 claim under the March agreement as a general, unsecured claim.

Army Aviation appealed the bankruptcy court's order, and the district court affirmed, but on different grounds. Reading the July agreement's future advance clause and defeasance clause together, the district court determined that the July agreement lacked "a clear and unambiguous intent" to include the loan under the March agreement. The district court found that the meaning of "sub-account" in the defeasance clause was not clear and unambiguous as to whether it was referring (1) to any sub-account under the July agreement, or (2) to any sub-account under any agreement between "you" and Army Aviation. The latter reading would include the March agreement debt but the former would not. The district court did not address the issue of whether the two agreements were "between the same parties." Army Aviation timely appealed.

## II. Standard of Review

In bankruptcy proceedings, we sit "as a second court of review and thus

7

examine[] independently the factual and legal determinations of the bankruptcy court." In re Optical Techs., Inc., 425 F.3d 1294, 1299-1300 (11th Cir. 2005) (quotation marks omitted). Neither the district court nor this Court is authorized to make independent factual findings. In re Sublett, 895 F.2d 1381, 1384 (11th Cir. 1990). We thus employ the same standard of review as the district court. In re Optical Techs., Inc., 425 F.3d at 1299-1300. We review legal conclusions by either the bankruptcy court or the district court de novo and the bankruptcy court's findings of fact for clear error. In re New Power Co., 438 F.3d 1113, 1117 (11th Cir. 2006).

The interpretation of a loan instrument is "a legal determination subject to de novo review if the contractual language is unambiguous." In re Sublett, 895 F.2d at 1384. Additionally, "the initial question whether the contractual language is ambiguous or not is itself a question of law." Id.

### III. Discussion

In a bankruptcy proceeding, state law governs the scope of the debtor's right to property, including ownership and security interests. Butner v. United States, 440 U.S. 48, 54, 99 S. Ct. 914, 918 (1979). The July agreement provided that Alabama law governs the contract. Accordingly, we look to Alabama law to determine the enforceability of the July agreement's future advance clause.

In Alabama, a future advance clause is enforceable if the clause is clear and unambiguous and extends security to cover a debt that is "between the same parties." See Ex parte Chandler, 477 So. 2d 360, 362 (Ala. 1985); see also Malkove v. First Nat'l Bank of Mobile, 326 So. 2d 108, 111 (Ala. 1976) ("'If a debtor owes several notes, and gives a mortgage expressly securing one, any intention to cover other existing notes should be quite clear and explicit.'" (quoting First Nat'l Bank v. Bain, 188 So. 64, 67 (Ala. 1939))). "Whether other debts between the same parties are secured under a future advance clause depends on the intention of the parties." Chandler, 477 So. 2d at 363. Future advance clauses and defeasance clauses are construed together as part of one instrument in determining whether an agreement intended to secure other indebtedness. See Underwood v. Jarvis, 358 So. 2d 731, 734 (Ala. 1978) (holding that a consideration clause and a defeasance clause should be construed together to determine the parties' intent to secure other indebtedness); Bain, 188 So. at 66 (same).

## A. Intent to secure other indebtedness

Here, the parties expressed a clear and unambiguous intent to secure other indebtedness through the plain language of the July agreement. For example, the language of the defeasance clause in the July agreement plainly covered "any other sub-account" without the use of limiting language. In addition, the July agreement plainly incorporated debts under "all existing balances for any obligation" owed to

9

Army Aviation. In contrast, the July agreement provided in other places that it was referring to "any sub-account <u>under this Agreement</u>." (Emphasis added.) On its face, the phrase "any other sub-account" in the defeasance clause embraced any other sub-account between the parties.

Moreover, the July agreement incorporated by reference the existing debt owed under other agreements, which included the March agreement. The July agreement provided that "all existing balances for any obligation that you owe to us may be incorporated within this Agreement" and that "[a]ll terms of all other agreements are incorporated by reference herein." Similarly, the July agreement's reference to the parties' default on "any other sub-account" in the defeasance clause also implicitly incorporated the balance owed under the March agreement. For the foregoing reasons, we conclude that the district court erred in finding that the parties did not intend for the July agreement to secure the debt owed under the March agreement.

**B. "Between the same parties"**

As mentioned, intent alone does not make the agreement enforceable. Alabama law also requires that the March agreement and the July agreement be "between the same parties." We conclude that these two agreements were "between the same parties" based on the Alabama law in <u>First Nat'l Bank v. Bain</u>, 188 So. 64 (Ala. 1939).

Specifically, in <u>Bain</u>, the Alabama Supreme Court determined that multiple agreements can be "between the same parties" when only one of the parties signs all of the agreements. <u>Id.</u> at 67. W.N. Bain and his wife Bessie A. Bain mortgaged their house to First National Bank "to secure the payment of the same, and any other indebtedness owing by the said W.N. Bain to the grantee before the full payment of this mortgage." <u>Id.</u> at 65. At the time the mortgage was executed, W.N. Bain already owed First National Bank under several agreements, including notes signed only by W.N. Bain, notes signed by Ewing Grizzell and indorsed by W.N. Bain, and notes signed by Bessie A. Bain and indorsed by W.N. Bain. The court found that because W.N. Bain was a party to each note, either as a maker or indorser, the "between the same parties" requirement had been met and the loan documents clearly and unambiguously expressed the nature and extent of the security taken. <u>Id.</u> at 67.

Much like W.N. Bain, Gladys Yelverton signed both agreements here as a debtor. Moreover, in the July agreement, Gladys agreed to be jointly and severally liable for all loans. The fact that two others also signed the July agreement does not change the fact that Gladys was a party to both agreements. To require complete identity of the parties to enforce a future advance clause to which the parties agreed would apply severally to each party would wrongfully rewrite the agreement that Gladys Yelverton willingly signed along with her joint borrowers.

11

We recognize that the bankruptcy court relied on <u>Ex parte Chandler</u>, 477 So. 2d 360 (Ala. 1985), but that case is entirely different and of limited value here. <u>Chandler</u> involved an unsecured creditor who purchased a loan and accompanying security interest from another creditor in the hope of securing its unsecured loan.[1] Because this case has nothing to do with a creditor buying a security interest to strengthen its claim on another loan and <u>Bain</u> is more on point, we rely on <u>Bain</u>.

Accordingly, we **VACATE AND REMAND** with instructions for the district court to vacate the judgment of and remand to the bankruptcy court to enter judgment in favor of Army Aviation on claim number six.

**VACATED AND REMANDED.**

---

[1] In <u>Chandler</u>, the Alabama Supreme Court determined that a third party cannot buy a security agreement for the purpose of securing an otherwise unsecured interest. 477 So. 2d at 363. In 1981, First Southern Development loaned Chandler's partnership $2.1 million, represented by a mortgage note and secured only by Chandler's personal guarantee. <u>Id.</u> at 361. In 1984, First Southern Federal Savings & Loan Association made a $50,000 loan to Chandler individually that was secured by an interest in Chandler's partnership's condominiums. <u>Id.</u> The $50,000 secured note contained a future advance clause providing that "the collateral and other security described herein is given to secure payment of this Note . . . and any and all other indebtedness or liabilities of Debtor . . . now existing or hereafter arising." <u>Id.</u> When both loans went unpaid, First Southern Development purchased the $50,000 secured note from First Southern Federal and was assigned all rights in the note. <u>Id.</u> at 362. Relying on the future advance clause, First Southern Development hoped its purchase of the note would secure its previously unsecured interest. <u>Id.</u> The Alabama Supreme Court recognized that "future advance clauses have not been interpreted to allow a third party to obtain security for an otherwise unsecured loan in this manner." <u>Id.</u> Noting that "in this contractual setting . . . the contemplation and intent of the debtor must be considered," the court found that a third party cannot secure an otherwise unsecured interest by buying another security agreement. <u>Id.</u> at 363.