PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 12-1521/2904
_____

In Re: W.R. Grace & Co., et al., Debtors

Her Majesty the Queen in Right of Canada,
Appellant in 12-1521

The State of Montana,
Appellant in 12-2904
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 11-cv-199)
District Judge: Hon. Ronald L. Buckwalter
_____

Argued
June 17, 2013

Before: AMBRO, FISHER and JORDAN, *Circuit Judges*.

(Filed: September 4, 2013)
_____

Jacqueline Dais-Visca
Senior Counsel
Ontario Regional Office
130 King Street West - #3400
Toronto, Ontario  M5X1K6

Kevin J. Mangan
Francis A. Monaco, Jr.   [ARGUED]
Matthew P. Ward
Womble, Carlyle, Sandridge & Rice
222 Delaware Avenue - #1501
Wilmington, DE   19801
        *Counsel for Appellant her Majesty the Queen*
        *In Right of Canada by the Attorney General of Canada*

Kevin J. Mangan
Francis A. Monaco, Jr.   [ARGUED]
Matthew P. Ward
Womble, Carlyle, Sandridge & Rice
222 Delaware Avenue - #1501
Wilmington, DE   19801
        *Counsel for Appellant State of Montana*


John Donley   [ARGUED]
Lisa G. Esayian
Adam C. Paul
Kirkland & Ellis
300 N. LaSalle Street
Chicago, IL   60654

Roger J. Higgins
111 E. Wacker Drive - #2800
Chicago, IL   60601

Laura D. Jones
Kathleen P. Makowski
James E. O'Neill, III
Pachulski Stang Ziehl & Jones
919 N. Market Street – 17th Fl.
Wilmington, DE   19801

Christopher Landau
Kirkland & Ellis
655 15th Street NW - #1200
Washington, DC   20005
        *Counsel for Appellee W.R. Grace & Co.*

Mark T. Hurford
Campbell & Levine
222 Delaware Avenue - #1620
Wilmington, DE   19801

Peter V. Lockwood   [ARGUED]
Caplin & Drysdale
One Thomas Circle, NW - #1100
Washington, DC   20005
        *Counsel for Appellee Official Committee of Asbestos*
        *Personal Injury*

Elisa Alcabes
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Robert J. Dehney
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Mary Beth Forshaw
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Andrew T. Frankel
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Neal J. Levitsky
Fox Rothschild
919 North Market Street
Citizens Bank Center
Suite 1300
Wilmington, DE 19801

4

Seth A. Niederman
Fox Rothschild
919 North Market Street
Citizens Bank Center
Suite 1300
Wilmington, DE 19801
*Counsel for Appellee Travelers Casualty & Surety Co*


Roger L. Frankel [ARGUED]
Orrick, Herrington & Sutcliffe
1152 15th Street, N.W.
Columbia Center
Washington, DC 20005
*Counsel for Appellee David T. Austern, Asbestos PI Future Claimants Representative*

Mark M. Maloney
Thaddeus D. Wilson
King  Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA   30309

Ashley C. Parrish
Matthew S. Owen
Carolyn M. Sweeney
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC   20006
    *Counsel for Amicus Curiae Imperial Tobacco Canada Limited*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

The State of Montana ("Montana") and Her Majesty Queen Elizabeth II in Right of Canada ("the Crown")[1] appeal the June 11, 2012 order[2] of the United States District Court for the District of Delaware affirming the Bankruptcy Court's confirmation of the plan of reorganization of W.R. Grace & Co, *et al.* ("Grace").[3] We conclude that the District Court

_____

[1] Although other courts of appeals have referred to the Queen by the territory over which she is sovereign, *see, e.g.*, *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1529 (D.C. Cir. 1990) (referring to "Her Majesty the Queen in Right of Ontario" as "Ontario"), for consistency's sake we adopt the term used by her counsel and the District Court, and further adopt the District Court's convention of referring to the sovereign as "it."

[2] The District Court first issued an order affirming the Bankruptcy Court's confirmation decision on January 30, 2012. *See In re W.R. Grace & Co.*, 468 B.R. 81 (D. Del. 2012). At the request of the parties, the Court subsequently addressed an additional issue not relevant to this appeal and, on June 11, 2012, it issued an amended and superseding opinion and order. *See In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012). Montana and the Crown appealed both orders, but the earlier order has since been withdrawn.

[3] For simplicity, we refer to the appellee-debtors collectively and in the singular as "Grace," as the District

6

correctly denied Montana's and the Crown's objections to plan confirmation, and we will accordingly affirm.

## I.  Background

### A.  *The Grace Bankruptcy*

This appeal arises from Grace's ongoing efforts to reorganize under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.*, in a manner that resolves all of its present and future asbestos liabilities. The company, which has manufactured and sold specialty chemicals and construction materials for more than a century, began facing asbestos-related lawsuits in the 1970s. Those lawsuits were based on alleged harm caused by a number of Grace's products and activities, including its operation of a vermiculite mine in Libby, Montana. Grace operated the mine from 1963 to 1990, and during that period the mining process released asbestos-containing dust into the atmosphere and allegedly sickened hundreds of area residents. Grace also had to confront many property damage lawsuits, including claims seeking recovery for the removal of asbestos-containing products from homes and businesses.

As a result of Grace's production of asbestos-containing materials, Montana and the Crown have been subject to asbestos-related lawsuits due to their alleged failure to warn their citizens of the risks posed by Grace's products

Court did. *See In re W.R. Grace & Co.*, 475 B.R. at 63 n.3. Grace actually consists of 62 separate entities. *See In re W.R. Grace & Co.*, 446 B.R. 96, 102 n.2 (Bankr. D. Del. 2011) (listing those entities).

and activities. Montana was named as a defendant in approximately 210 cases in Montana state courts, based on allegations that Montana officials failed to warn people in the vicinity of the vermiculite mine that they were at risk of asbestos exposure. Some of the cases also involved claims that Montana aided and abetted Grace's allegedly unlawful activities. In 2004, the Montana Supreme Court held that the state had a duty to warn residents of "workplace conditions known to be hazardous to health," but the court did not resolve whether Montana had breached that duty. *Orr v. State*, 106 P.3d 100, 110, 118 (Mont. 2004). The state settled all of those cases for $43 million in 2011. As for the Crown, it has been named as a defendant in several failure-to-warn class action lawsuits involving property damage and personal injury claims arising from the use of "Zonolite Attic Insulation" ("ZAI"), a Grace insulation product that contains trace amounts of asbestos. The Crown further asserts that there may be future asbestos claims against it. Because of their exposure to asbestos liability, Montana and the Crown contend that they are entitled to contribution and indemnification from Grace.[4]

By 2001, the number of asbestos-related lawsuits against Grace had grown to 65,000, which threatened the company's financial viability and prompted it to file for Chapter 11 protection. Grace hoped that it could use § 524(g) of the Bankruptcy Code, 11 U.S.C. § 524(g), to establish a means for resolving the thousands of present and future

---

[4] The Crown also claims to have direct property damage claims against Grace due to "costs incurred to seal attics and otherwise remediate ZAI installed in homes on military bases in Canada." (Crown Opening Br. at 14.)

asbestos-related claims against the company. That provision, discussed in depth herein, allows a company like Grace to set up a trust that will assume its asbestos liabilities. The statute likewise authorizes an injunction to channel all asbestos-related claims to such a trust. *See* 11 U.S.C. § 524(g)(1)(A), (2)(B). Section 524(g) thus allows companies to emerge from bankruptcy free of asbestos liability, but only if the particular channeling injunction in the case satisfies certain prerequisites, including that it be "fair and equitable" to future claimants. *See id.* § 524(g)(4)(B)(ii).

It took Grace and its creditors' committees seven years of contentious negotiations and litigation to reach an agreement regarding the basic structure of the company's reorganization. The litigation included a protracted dispute over estate assets, which focused on Grace's transfer of billions of dollars to two former affiliates, as well as numerous disagreements with Grace's insurance providers. Those disputes eventually settled, resulting in the allocation of more than 1.5 billion dollars to a proposed § 524(g) trust.

Grace also worked to resolve disputes with the nearly 130,000 claimants who brought pre-petition asbestos personal injury and property damage claims. The company successfully settled with the vast majority of claimants bringing what came to be called "traditional" property damage claims – *i.e.*, claims that do not involve ZAI – and it reached global agreements addressing the resolution of present and future ZAI property damage claims. With regard to the personal injury claims, Grace and the claimants engaged in extended negotiations over the estimated value of Grace's personal injury liabilities and the corresponding amount needed to adequately fund a § 524(g) trust. In April

9

2008, the Bankruptcy Court held an "estimation trial" to resolve those questions. At that trial, representatives for the personal injury claimants, which included the personal injury creditors' committee (the "PI Committee") and a court-appointed future claimants' representative, presented expert testimony that estimated Grace's liability to be somewhere between 6.3 and 7.4 billion dollars. Grace's experts, on the other hand, put the company's liability at 468 million dollars. Given that disparity, the parties opted for settlement and agreed to a term sheet that created the essential structure of a joint plan.

### B. *The Joint Plan*

Soon after that settlement in April 2008, Grace, the PI Committee, the future claimants' representative, and the equity committee proposed a Joint Plan of Reorganization (the "Plan" or the "Joint Plan"),[5] the central pillars of which are two trusts – a personal injury trust and a property damage trust – that will assume all of Grace's current and future asbestos liabilities. The Joint Plan also provides for a § 524(g) channeling injunction, which will send all asbestos-related claims against Grace (and certain protected third parties), including future claims, to the trusts, allowing the protected parties to be "unconditionally, irrevocably and fully released" from "any and all Asbestos-Related Claims." (J.A. at 200117.) As its name suggests, the personal injury trust will assume all of Grace's direct and indirect asbestos

---

[5] The Joint Plan was initially filed on September 19, 2008, and a "finalized" version was filed on February 27, 2009. The Plan continued to undergo modifications, however, through December 23, 2010.

10

personal injury liabilities.[6]  It is funded by the 1.5 billion dollars obtained through settlements with Grace's insurers and former affiliates, by an initial payment from Grace of 450 million dollars, by a warrant to acquire 10 million shares of Grace common stock at 17 dollars a share, and by deferred cash payments from Grace of 100 to 110 million dollars per year through 2033.[7]  In total, those funding sources will provide more than 3 billion dollars to the trust.  The property damage trust will likewise assume all of the protected parties' direct and indirect property damage liabilities, including ZAI property damage claims, and it is funded by an initial payment of 180 million dollars, and a subsequent payment of

---

[6]  Specifically, the personal injury trust will "assume the liabilities of the Debtors with respect to all Asbestos [Personal Injury] Claims," and will "process, liquidate, pay and satisfy all Asbestos [Personal Injury] Claims in accordance … with [the] Plan." (J.A. at 200092.)  The Plan's definition of an Asbestos Personal Injury Claim includes any claim against Grace that, "directly or indirectly," is "based on, arising out of, resulting from, or attributable to … death, wrongful death, personal or bodily injury …, sickness, disease, loss of consortium, survivorship, medical monitoring, or other personal injuries," and "the presence of or exposure at any time to" Grace's asbestos products or production. (J.A. at 200041.)  It therefore includes personal injury claims arising from ZAI.

[7]  The deferred payments to the trust are secured by a majority of Grace's common stock.

30 million dollars.[8]  Some of that money will then be transferred to a special fund that will be used to compensate Canadian ZAI property damage claimants.

In addition to being separately funded, the two trusts proposed by the Joint Plan have separate mechanisms for resolving claims.  Claims brought against the personal injury trust are to be resolved in accordance with the personal injury trust agreement and the "trust distribution procedures," or "TDPs."  The TDPs establish two primary methods by which claims will be assessed, valued, and paid.  Under an "expedited review" process, claims will be categorized and assigned a set amount of recovery according to a schedule of eight asbestos-related disease levels, some of which require demonstration of certain medical or exposure criteria. Claimants who do not meet those criteria, or who "seek to establish a liquidated value for the claim that is greater than its Scheduled Value," will also have the option of utilizing an individual review process, which could involve arbitration or litigation of their claims.  (J.A. at 200293.)  Both the expedited review and the individual review will result in a determination of the liquidated value of a claim.  Claimants will not be paid the full liquidated value, however.  Rather, each claimant will recover a certain percentage of the liquidated value of his or her claim – a "Payment Percentage" – in order to ensure that there is money left for future claimants to receive comparable recoveries.  The TDPs set the initial Payment Percentage at between 25% and 35%, meaning that personal injury claimants should receive

---

[8]  Subject to certain conditions, reorganized Grace is also obliged to make additional future payments to the trust if needed to satisfy future demands.

somewhere between 25% and 35% of the liquidated value of their claims. That percentage may "be adjusted upwards or downwards from time to time … to reflect then-current estimates of the [personal injury] [t]rust's assets and its liabilities, as well as [the] then-estimated value of then-pending and future claims." (J.A. at 200296.) All claims are also limited to a "maximum value" based on the relevant disease level, unless the claim qualifies as an "extraordinary claim,"[9] in which case it is capped at the "maximum extraordinary value" for such claims. Claims will be paid on a "first-in, first-out" basis, which means that a claimant can recover from the trust as soon as the value of the claim is established. The trust will be administered by designated trustees, in consultation with a Trust Advisory Committee and the future claimants' representative.

The property damage trust resolves claims somewhat differently. Under the agreement governing that trust, all allowable "traditional" property damage claims will be paid in full, and there is no expedited process for determining the value of a claim. ZAI property damage claims brought by United States residents will also be paid from the property damage trust, but they will be resolved in accordance with procedures that closely resemble the personal injury TDPs.

---

[9] An "extraordinary claim" is a claim held by someone "whose exposure to asbestos … occurred predominately as a result of working in a manufacturing facility of Grace … or … was at least 75% the result of exposure to asbestos or an asbestos-containing product or to conduct for which Grace has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere." (J.A. at 200323.)

13

Canadian ZAI property damage claimants will be paid pursuant to a settlement agreement reached by representatives of those claimants and Grace.

In addition to establishing the two § 524(g) trusts, the Joint Plan divides claimants into eleven classes, one of which is further divided into two subclasses.[10]  Relevant here, Class 6 includes all asbestos personal injury claims (including Canadian and U.S. ZAI personal injury claims), Class 7A includes traditional asbestos property damage claims, Class 7B includes U.S. ZAI property damage claims, and Class 8 includes Canadian ZAI property damage claims.[11]  Like the

---

[10]  Both Montana and the Crown filed proofs of claim against Grace during its bankruptcy case.

[11]  The full list of classes provided for in the Joint Plan is as follows:

> Class 1: Priority Claims
> Class 2: Secured Claims
> Class 3: Employee Benefit Claims
> Class 4: Workers' Compensation Claims
> Class 5: Intercompany Claims
> Class 6: Asbestos Personal Injury Claims
> Class 7A: Asbestos Property Damage Claims, excluding United States ZAI Claims
> Class 7B: United States ZAI Claims
> Class 8: Canadian ZAI Claims

14

trusts, those classes do not distinguish between direct and indirect claims, and so Montana's claims for indemnification and contribution are classified in Class 6 alongside claims brought directly by people allegedly harmed by Grace's activities. The Crown's claims fall into two different classes; any claims arising from personal injury ZAI suits are grouped in Class 6, whereas all direct and indirect ZAI property damage claims are in Class 8. Both of those classes are considered to be "impaired classes," as is Class 7B, because claimants in those classes will not be able to recover the full value of their liquidated claims. All of the claims in Classes 6, 7, and 8 are subject to the channeling injunction provided for in the Joint Plan.

C.    *Procedural History*

Following the submission of the Joint Plan, the bankruptcy trustees solicited votes from members of the impaired classes and the classes whose claims would be channeled to the trusts. Each of the classes of channeled claims easily cleared the hurdle of a 75 percent vote in favor of the Plan, as is required by § 524(g), *see* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (providing that a class of claimants "whose claims are to be addressed by a trust" must "vote[], by at least 75 percent of those voting, in favor of the plan"),

---

Class 9: General Unsecured Claims
Class 10: Equity Interests in the Parent
Class 11: Equity Interests in Debtors Other Than the Parent

15

and the only other class that the Joint Plan considers to be "impaired" (Class 11 – the equity holders) also voted for the Plan.[12] The Bankruptcy Court then held a sixteen-day confirmation hearing, which began on September 8, 2009. During that hearing, numerous parties, including Montana and the Crown, objected to confirmation of the Joint Plan on the basis that it did not comply with the requirements of the Bankruptcy Code. In particular, Montana and the Crown argued that their claims could not properly be considered in Class 6, that they were improperly subject to the channeling injunction, and that they were treated unfairly under the Plan.

After the Bankruptcy Court heard testimony and argument from both the Plan proponents and the objectors, the Plan was amended to address many of the objections. The Court then entered a confirmation order on January 31, 2011, and overruled the remaining objections, including the objections of Montana and the Crown. *In re W.R. Grace & Co.*, 446 B.R. 96, 102-03 (Bankr. D. Del. 2011).[13] On appeal, the District Court affirmed the Bankruptcy Court's order,

---

[12] Another class of creditors – bank lenders in the "general unsecured creditors" class – also claim to be impaired, and did not vote in favor of the Joint Plan. Their objections to the Plan are the subject of a different appeal.

[13] On February 15, 2011, the Bankruptcy Court issued an order clarifying the January 31, 2011 order and memorandum opinion, which made "clear that the Joint Plan as modified is confirmed" and requested "that the District Court issue and affirm the Confirmation Order … including, without limitation, the injunction pursuant to § 524(g)(3)." (J.A. at 100081.)

accepting as "reasonable" the inclusion of Montana's and the Crown's claims in classes with direct asbestos claims, *In re W.R. Grace & Co.*, 475 B.R. 34, 110 (D. Del. 2012), and concluding that their claims "are properly enjoined and channeled to the trust," *id.* at 111, and that "the record is devoid of any evidence indicating disparate treatment" of their claims, *id.* at 136. The Court therefore held that the Bankruptcy Court had properly overruled Montana's and the Crown's objections to plan confirmation. This timely appeal followed.

## II.    Discussion[14]

Montana and the Crown both argue on appeal that the Bankruptcy Court and the District Court erred in confirming

---

[14] The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(b). The District Court had appellate jurisdiction over the Bankruptcy Court's decision under 28 U.S.C. § 158(a). We have jurisdiction over this appeal pursuant to 28 U.S.C. §§ 158(d) and 1291. We exercise "plenary review of an order from a district court sitting as an appellate court in review of a bankruptcy court." *In re Exide Techs.*, 607 F.3d 957, 961-62 (3d Cir. 2010). Under that standard, "[w]e review the District Court's conclusions of law de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.19 (3d Cir. 2004). Under the clearly erroneous standard, we must uphold the Bankruptcy Court's factual findings unless we are "left with the definite and firm conviction that a mistake has been committed." *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (internal quotation marks omitted).

17

Grace's Joint Plan of Reorganization because the Plan fails to comply with the applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(1) ("The court shall confirm a plan only if … [t]he plan complies with the applicable provisions of this title."). Although they raise many specific objections, which we discuss *infra*, Montana and the Crown have three fundamental complaints about the Plan: (1) it wrongly channels their claims to the § 524(g) trusts; (2) it discriminates against their claims for indemnification and contribution;[15] and (3) it is not "fair and equitable" to future claimants. We address each of those contentions in turn, and conclude that each was rightly rejected.

### A.     *The Channeling Injunction*

Montana and the Crown attempt to escape the scope of the channeling injunction by invoking two different provisions of the Bankruptcy Code. First, they say that § 524(g) does not encompass their claims against Grace. They argue that they lack "claims" or "demands" as those terms are used in § 524(g), and that that provision does not permit the channeling of the particular kind of claims they do have, namely claims for indemnification or contribution. Second, they contend that § 1122 should prevent their claims from being placed in the same class as direct personal injury claims. Both arguments do not persuade us, as § 524(g) broadly encompasses all asbestos-related actions against the

---

[15]     The Crown raises two independent arguments in this regard, contending that the Plan grants preferential treatment to U.S. claims and impermissibly prevents indirect claimants from qualifying for "extraordinary claim" status. We address those claims in Section II.B, *infra*.

18

debtor, including claims for indemnification and contribution, and because such claims are sufficiently similar to direct personal injury claims that they can be classified together under § 1122.

### 1. *Section 524(g)*

As we have explained on previous occasions, § 524(g) "provides a special form of supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability." *In re Combustion Eng'g*, 391 F.3d 190, 234 (3d Cir. 2004); *see also In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 362 (3d Cir. 2012) (describing § 524(g) as a "quasi-administrative process" for resolving a company's asbestos liabilities). Modeled after the "creative solution" to asbestos liability developed during the bankruptcy of the Johns-Manville Corporation, *Federal-Mogul*, 684 F.3d at 359 (internal quotation marks omitted), § 524(g) permits all asbestos-related claims against the debtor to be channeled to a trust, and thus it "relieves the debtor of the uncertainty of future asbestos liabilities," *Combustion Eng'g*, 391 F.3d at 234. *See also* H.R. Rep. No. 103-835, at 40 (1994) (explaining that § 524(g) "is modeled on the trust-injunction in the Johns-Manville case").[16] By removing that uncertainty and

---

[16] The Johns-Manville Corporation was formerly the world's largest miner of asbestos, and it filed for bankruptcy in 1982. *Kane v. Johns-Manville Corp*, 843 F.2d 636, 639 (2d Cir. 1988). Its plan of reorganization pioneered the use of a trust and a channeling injunction to equitably resolve the company's asbestos liabilities. *Id.* at 690; *see also In re Federal-Mogul Global Inc.*, 684 F.3d 355, 359 (3d Cir. 2012)

allowing the debtor to emerge from bankruptcy free of all asbestos liability, § 524(g) facilitates the company's ongoing viability, which in turn provides the trust "with an 'evergreen' source of funding to pay future claims." *Combustion Eng'g*, 391 F.3d at 234. In order to qualify for that relief, however, a debtor must satisfy certain prerequisites designed to ensure that future asbestos claimants will be treated fairly. *Federal-Mogul*, 684 F.3d at 359 n.9; *see also* 11 U.S.C. § 524(g)(2). The statute thus furthers two goals: ensuring the equitable resolution of present and future asbestos claims, and "enabling corporations saddled with asbestos liability to obtain the 'fresh start' promised by bankruptcy." *Federal-Mogul*, 684 F.3d at 359.

At issue in this case is the proper scope of a § 524(g) channeling injunction. Montana and the Crown argue that, under § 524(g), their legal efforts to obtain indemnification and contribution cannot be channeled to a trust. They say the statute "only enjoins 'claims' or 'demands,'" and that their particular claims – what they like to call "requests" – do not fall within the definition of either term. (Montana Opening

---

("The primary bankruptcy innovation for addressing mass tort liability has been the post-confirmation trust, which first appeared in the bankruptcy proceedings of the Johns-Manville Corporation … ."). The Johns-Manville plan significantly underestimated the number of claims that would be filed, however, and the trust rapidly became insolvent. *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 769 (2d Cir. 1996). As a result, subsequent litigation produced a settlement agreement that imposed new trust distribution procedures intended to preserve value for future claimants. *Id.* at 770-71.

20

Br. at 26.) They further indicate that, even if they do hold "claims" or "demands" within the meaning of § 524(g), those claims are not the sort that can be channeled to a trust. They assert that § 524(g) permits a channeling injunction to extend only to personal injury, wrongful death, and property damage actions, not to their claims for indemnification and contribution, which are "of a different nature" because they arise from Montana's and the Crown's alleged failures to warn their citizens of the dangers of Grace's activities.[17] (Montana Opening Br. at 25.) Grace responds that both arguments misunderstand the text, history, and purpose of § 524(g), which is designed to permit all asbestos-related actions against the debtor – both direct and indirect – to be channeled to a trust, including actions for contribution and indemnification.

To determine whether the scope of § 524(g) encompasses "requests" like those that Montana and the Crown plan to make, we look first to the text of that provision. Section 524(g) allows a court "to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in [§ 524(g)(2)(B)(i)] … ." 11 U.S.C. § 524(g)(1)(B). Put more simply, "any claim or demand" that

---

[17] In their briefing, Montana and the Crown make those arguments in reverse order. We address them in the order here because it seems more logical to consider whether Montana and the Crown have claims at all before determining if the substance of those claims is proper.

will be paid by a § 524(g) trust cannot, because of the § 524(g) injunction, be brought against the debtor.

That brings us to the question of what constitutes a "claim or demand." The Bankruptcy Code defines a "claim" using the "broadest available definition," *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (internal quotation marks omitted), which provides that a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured," 11 U.S.C. § 101(5)(A). Section 524(g) takes that definition and expands it even further, including within the sweep of the channeling injunction not only "claims" but also "demands." *Id.* § 524(g)(1)(B). A "demand" is then defined as a "demand for payment, present or future" that "was not a claim during the proceedings leading to the confirmation of a plan of reorganization" but "arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction." *Id.* § 524(g)(5). A § 524(g) channeling injunction can therefore include any right to or demand for payment that arises from the debtor's underlying asbestos liabilities, regardless of when that right or demand arises, whether it was raised during the bankruptcy proceeding or is contingent on a future event.

Despite the breadth of those definitions, Montana and the Crown contend that their particular "requests" for contribution and indemnification somehow fall outside of the channeling injunction's scope. They say that their "requests" cannot be considered "claims" because claims for contribution and indemnification do not technically arise until a judgment or settlement has been paid, and at the time of

22

Grace's bankruptcy petition no such judgments had been entered against either Montana or the Crown. Their "requests" are also not "demands," they explain, because those requests are not personal injury, wrongful death, or property damage claims, and thus they did not "aris[e] out of the same or similar conduct" as the claims subject to the injunction. *See id.* § 524(g)(5)(B).

While those arguments reflect some creativity, they are ultimately unpersuasive. Montana's and the Crown's assertion that a "claim" arises when it fully accrues is based on the now-rejected reasoning of *Avellino & Bienes v. M. Frenville Co.* (*In re Frenville*), 744 F.2d 332, 335-36 (3d Cir. 1984), which we explicitly overruled in *In re Grossman's, Inc.*, 607 F.3d 114 (3d Cir. 2010) (en banc). *See Grossman's*, 607 F.3d at 121 (holding that the "accrual test" previously established in *Frenville* "should be and now is overruled").[18] The law in this Circuit now is that "a claim arises when an

---

[18] *In re Frenville* held that "a 'claim,' as that term is defined by the Bankruptcy Code, arises when the underlying state law cause of action accrues." *Grossman's*, 607 F.3d at 118 (citing *In re Frenville*, 744 F.2d at 337). That approach to determining when a claim arises was uniformly criticized as incompatible with the broad definition of "claim" in the Bankruptcy Code, *id.* at 120, and in *Grossman's* we rejected it in favor of the rule that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code," *id.* at 125. Two years later, in *Wright v. Owens Corning*, we expanded that holding to include conduct that occurs post-petition but pre-confirmation. 679 F.3d 101, 106-07 (3d Cir. 2012).

23

individual is exposed pre-confirmation to a product or other conduct giving rise to an injury that underlies a 'right to payment' under the Code." *Wright v. Owens Corning*, 679 F.3d 101, 107 (3d Cir. 2012) (emphasis omitted). A "claim" can therefore exist "before a right to payment exists under state law." *Grossman's*, 607 F.3d at 121. Regardless of when Montana and the Crown may have had judgments entered against them,[19] the material fact is that Grace's asbestos-related activities underlie any rights to indemnification and contribution that they can assert. Grace's relevant activities all occurred long before its bankruptcy filing, and thus, to the extent that Montana and the Crown have "claims," those claims arose before confirmation of the Joint Plan.

For largely the same reason, Montana's and the Crown's argument regarding "demands" also fails. Although they claim that requests for contribution and indemnification do not "aris[e] from" the same conduct as personal injury or property damage claims, that argument ignores the underlying basis for such requests: Grace's alleged asbestos liability. Any action that Montana and the Crown say they have against Grace arises from the same events as do all the other claims and demands covered by the channeling injunction, namely Grace's production of asbestos-containing materials. Therefore, if Montana and the Crown have requests for

---

[19] Montana says that, "with the exception of one complaint, [it] was not named as a defendant in any … State Court Actions until after the Petition Date." (Montana Opening Br. at 10.) It appears, however, to have settled all of the state court claims against it prior to confirmation of the Joint Plan.

24

payment that were not "claims" during the bankruptcy proceeding, those requests would meet the definition of "demand" in § 524(g). *See* 11 U.S.C. § 524(g)(5).

More fundamentally, the arguments made by Montana and the Crown are based on a misunderstanding of the purpose of § 524(g). By arguing that they have "requests" for payment from Grace that cannot be called "claims" or "demands," Montana and the Crown suggest that those terms constitute discreet categories, and that some asbestos-related actions fall into neither category and thus cannot be subject to § 524(g). The text and history of § 524(g) tell us just the opposite. As for the text, § 524(g)'s definition of "demand" overlaps to some degree with the Bankruptcy Code's definition of "claim" – a "demand" could be a request for payment that was not raised during the bankruptcy proceeding, which also fits the Code's definition of a "claim." Furthermore, by taking the already broad definition of "claim" and expanding it to include all other "demands for payment" that arise from the same conduct, § 524(g) evinces an intent to include *all* potential asbestos-related liability of a debtor, regardless of when such liability arose. *See* 11 U.S.C. § 524(g)(1)(B), (5).

That intent is also reflected in the history and purpose of the provision. Congress enacted § 524(g) in part because of the long latency period of many asbestos-related diseases, which, in cases like this, typically creates a large pool of future claimants whose disease has not yet manifested. *See* H.R. Rep. No. 103-835, at 40 (1994) (noting that "[a]sbestos-related disease has a long latency period" of "up to 30 years or more"). Congress was concerned about those claimants for two reasons – they lack the ability to protect their own

25

interests during the bankruptcy proceeding, and they create tremendous uncertainty for companies in Grace's position, which can hinder a company's financial rebound and limit available recovery for all asbestos victims. *See id.* (explaining that future claimants "do not have their own voice" and that "lingering uncertainty" can "undermine[] the 'fresh start' objectives of bankruptcy and the goals of the trust arrangement"); *see also In re Flintkote Co.*, 486 B.R. 99, 124 (Bankr. D. Del. 2012) ("In part because of long latency periods of certain asbestos-related illnesses, Congress enacted § 524(g) to protect the due process rights of the exposed yet unimpaired.").

Section 524(g) addresses those concerns by imposing requirements to protect the rights of future claimants, and then, if those requirements are met, channeling all present and future asbestos-related liability to a trust funded by the debtor. Congress wanted to cover the whole set, and it did. The distinction, to the extent there is one, between a "claim" and a "demand" is therefore unimportant to the scope of the channeling injunction; the relevant question is instead whether an action seeks recovery that stems from the debtor's asbestos-related liabilities. If it does, then it falls somewhere within the broad category of "any claim or demand," and can be subject to a channeling injunction.

Montana and the Crown dispute the breadth of that interpretation, arguing that, for due process reasons, their requests cannot be channeled to a trust. They cite our recent decision in *Wright v. Owens Corning*, *see supra* note 18, which concluded that due process prevents some claims from being discharged by reorganization plans that were proposed and confirmed during the *Frenville* era. 679 F.3d at 107-09.

26

Because the law during those bankruptcies was that claims arise when they accrue, some potential claimants might have received notice of a bankruptcy but failed to file a claim because they understood that their claims had not yet "arisen." *Id.* at 108. Therefore, although claims against a debtor are generally discharged by plan confirmation, such claimants lacked adequate notice for their claims to have been discharged without violating due process.

But *Owens Corning* is inapposite, because the bankruptcy plan at issue in that case did not involve a § 524(g) trust and channeling injunction. Although Montana's and the Crown's claims against Grace will be discharged, § 524(g) sends those claims, along with all other asbestos-related claims and demands, to a trust. Montana and the Crown will therefore have an opportunity to litigate their claims and potentially obtain relief, which means that the due process concern in *Owens Corning* – that claimants would lose any opportunity for relief without first receiving proper notice – is not implicated. Rather, the potential due process issue associated with channeling claims to a trust is the fairness of forcing future claimants, many of whom might have had no notice at all of the bankruptcy, to bring their claims against a trust rather than against the debtor directly. That concern is addressed by the proper application of § 524(g). As we explained in *Combustion Engineering*, and again in *Grossman's*, § 524(g) includes a number of requirements that "are specifically tailored to protect the due process rights of future claimants," such as the "fair and equitable" provision and the mandatory seventy-five percent approval requirement. *Combustion Eng'g*, 391 F.3d at 234 n.45 (citing, *inter alia*, 11 U.S.C. § 524(g)(4)(B)(ii), (g)(2)(B)(ii)(IV)(bb)); *see also Grossman's*, 607 F.3d at 127

27

("By enacting § 524(g), Congress took account of the due process implications of discharging future claims of individuals whose injuries were not manifest at the time of the bankruptcy petition."). Therefore, as long as a court correctly determines that § 524(g)'s requirements are satisfied, present and future claims can be channeled to a § 524(g) trust without violating due process.[20]

Montana's and the Crown's next argument is that their claims for indemnification and contribution are substantively different from Grace's other asbestos-related liabilities, and thus cannot be channeled to the trust for that reason. They base that contention on § 524(g)(2)(B)(i), which explains that the purpose of a trust "is to assume the liabilities of a debtor

---

[20] Montana and the Crown also contend that, under *Owens Corning*, they cannot be considered to have "claims." They base that contention on *Owens Corning*'s discussion of the lingering effect of our overruled *Frenville* decision. *See Owens Corning*, 679 F.3d at 109 (explaining that *Frenville* must continue to define when certain claims can be discharged, for the due process reasons discussed above). But that discussion does not help their case, because in *Owens Corning* we did not hold that *Frenville* continues to define when a claim arises – we held only that "[t]he shadow of *Frenville*" prevents some claims from being discharged. *Id.* Indeed, the opinion explicitly separates those two issues, concluding that an individual did hold a claim during the bankruptcy, but that the claim could not be discharged without violating due process. *Id.* at 107. Montana's and the Crown's contention that they do not even hold claims is therefore flatly contradicted by both *Grossman's* and *Owens Corning*.

which … has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products." 11 U.S.C. § 524(g)(2)(B)(i)(I). Montana and the Crown assert that, because of that language, only asbestos-related personal injury, wrongful death, and property damage actions can be subject to the channeling injunction.

The argument fails, however, since § 524(g) expressly states that a court can "enjoin entities from taking legal action for the purpose of directly *or indirectly* collecting" on a claim or demand that is to be paid by a trust. *Id.* § 524(g)(1)(B) (emphasis added). Although they are each being sued under a failure-to-warn theory of liability, Montana and the Crown concede that they only have claims against Grace because the plaintiffs bringing the failure-to-warn lawsuits were allegedly harmed by Grace's asbestos-related products and operations. In other words, behind each failure-to-warn suit against Montana and the Crown is a plaintiff with a personal injury, wrongful death, or property damage claim against Grace. More precisely, there must be such a plaintiff in order for Montana and the Crown to have a basis for their claims at all. Montana's and the Crown's actions against Grace therefore are brought "for the purpose of … indirectly … receiving payment or recovery" for asbestos-related personal injury and property damage claims against the debtor, and thus are subject to the § 524(g) channeling injunction under the plain language of that statute. *See* 11 U.S.C. § 524(g)(1)(B), (2)(B).

That interpretation is consistent with the purpose of § 524(g). As noted above, the statute was modeled on the

29

trust established in the Johns-Manville bankruptcy, which subjected all asbestos-related claims, including "indemnification or contribution liabilities or obligations" of the debtor, to a channeling injunction. (Plan Proponents App. at 602040 (the Manville Corporation Second Amended Restated Plan of Reorganization, at 2).) Inclusion of such liabilities in the injunction is also a matter of practicality, because one of the primary goals of § 524(g) is to allow a debtor to "emerge[] from bankruptcy free and clear" of asbestos liability, and thus enable the debtor to "grow[] the pie available to victims" (provided, of course, that asbestos claimants' interests are adequately protected). 140 Cong. Rec. S4521-01 (daily ed.) (Apr. 20, 1994) (statement of Sen. Brown). If the reorganized debtor could still be exposed to indirect asbestos claims for indemnification and contribution, lingering uncertainty regarding the scope of that liability would threaten the debtor's recovery and hinder Congress's objective of providing "an 'evergreen' source of funding to pay future claims." *Combustion Eng'g*, 391 F.3d at 234.

Finally, the narrow interpretation of § 524(g) advanced by Montana and the Crown is unsupported by any caselaw and would effectively rewrite the provision. Montana and the Crown offer no explanation for § 524(g)'s explicit inclusion of actions that "indirectly" seek recovery on asbestos-related claims. Instead, they simply ignore that language and assert that § 524(g) addresses only direct personal injury, wrongful death, and property damage actions. But we are not free to ignore an express provision of the statute, as it is our "judicial duty to give faithful meaning to the language Congress adopted." *United States v. Bornstein*, 423 U.S. 303, 309 (1976). It is a mystery what Congress could have meant by an action that "indirectly" seeks recovery if it did not mean to

include an action seeking indemnification or contribution. Little wonder, then, that courts have consistently upheld the channeling of such claims to § 524(g) trusts. *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 168-69 (D. Del. 2006) ("Because Indirect PI Trust Claims … relate to direct Asbestos Personal Injury Claims, they are appropriately channeled to the Asbestos PI Trust and have historically been channeled to trusts established in connection with asbestos related chapter 11 cases."); *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 582 (Bankr. W.D. Pa. 2011) (concluding that "an entity that may pay a future demand holder and thereby acquire an indirect claim" against the debtor has "interests that are no different from any other Indirect Claimant's interests," and the entity's claims can thus be channeled to a § 524(g) trust); *In re Celotex Corp.*, 204 B.R. 586, 622 (Bankr. M.D. Fla. 1996) (enjoining any claim or demand "asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind" against the debtor).

We therefore conclude that the Bankruptcy Court and the District Court correctly held that Montana's and the Crown's claims for indemnification and contribution are subject to the channeling injunction included in the Joint Plan. Section 524(g) gives courts the express authority to "enjoin entities from taking legal action for the purpose of directly or indirectly … recovering … with respect to any claim or demand that … is to be paid … by a [§ 524(g)] trust," 11 U.S.C. § 524(g)(1)(B), which is precisely the type of action that Montana and the Crown each wish to take against reorganized Grace. The channeling injunction thus properly encompasses their claims, and their arguments to the contrary were rightly rejected.

31

## 2.      *Section 1122*

Having decided that § 524(g) permits a channeling injunction to extend to the claims asserted by Montana and the Crown, we can readily dispense with the argument that those claims were improperly placed in Class 6, which includes all asbestos personal injury claims.[21]  Under § 1122 of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  To determine whether claims are "substantially similar," the proper focus is on "the legal character of the claim as it relates to the assets of the debtor." *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986) (emphasis omitted); *see also In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012) (concluding that the phrase "substantially similar" reflects "the legal attributes of the claims, not who holds them" (internal quotation marks omitted); *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("Claims are similar if they have substantially similar rights to the debtor's assets." (emphasis and internal quotation marks omitted)).  The Bankruptcy Court has "broad discretion" to decide if a plan satisfies that requirement, and we will uphold a plan's classification scheme so long as it is "reasonable" and does not "arbitrarily designate classes."  *In the Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (internal quotation marks

---

[21]  Although some of the Crown's claims are classified in Class 8 (Canadian ZAI Claims), *see supra* Section I.B, it only challenges the classification of its indirect personal injury claims in Class 6 (Asbestos Personal Injury Claims).

32

omitted); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (interpreting § 1122(a) to bar the debtor from "arbitrarily" designating classes or doing so in a manner that "would not serve any legitimate purpose").

Here, Montana and the Crown identify only one difference in "legal effect against the debtor's assets" between their claims and the other claims in Class 6: their claims "are not subject (or should not be subject) to an injunction imposed pursuant to Bankruptcy Code section 524(g)." (Montana Opening Br. at 43.) That argument fails, because, for all of the reasons already discussed, their claims certainly are subject to the channeling injunction. Moreover, as the District Court observed, "[b]oth direct and indirect claims under the Plan exhibit a similar effect on Grace's bankruptcy estate – they seek recovery from the trust for actions related to Grace's asbestos liability." *In re W.R. Grace & Co.*, 475 B.R. at 110. Although Montana and the Crown must first be held liable for failure to warn before they can bring a claim against the trust, that makes no difference to Grace, as its liability for such a claim depends solely on its asbestos-related activities. The Joint Plan therefore reasonably classified claims for indemnification and contribution together with direct personal injury claims.

B.     *Disparate Treatment of Creditors*

33

We turn next to the contention that the Joint Plan should not have been confirmed because the TDPs[22] may result in disparate treatment among claims within the same class. As Montana and the Crown correctly note, "equality of distribution among creditors is a central policy of the Bankruptcy Code" that is furthered by several different Code provisions. *In re Combustion Eng'g*, 391 F.3d at 239 (quoting *Bergier v. IRS*, 496 U.S. 53, 58 (1990) (internal quotation marks omitted). Relevant here, § 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class," 11 U.S.C. § 1123(a)(4),[23] and § 524(g) mandates that "present claims and future demands that involve similar claims" be paid "in substantially the same manner," *id.* § 524(g)(2)(B)(ii)(V). Together, the two provisions ensure that claims in a class that will be channeled to a § 524(g) trust receive the same treatment, regardless of when they are brought. In determining whether a plan provides for the same treatment of claimants in a class, "we consider the bankruptcy scheme as an integrated whole." *In re Combustion Eng'g*, 391 F.3d at 241.

Although "neither the Code nor the legislative history precisely defines the standards of equal treatment," *In re AOV*

---

[22]    The TDPs, as earlier noted, *see supra* Section I.B, are the trust distribution procedures for the personal injury trust established in the Joint Plan.

[23]    Section 1123 permits disparate treatment when "the holder of a particular claim or interest agrees to … less favorable treatment," but neither Montana nor the Crown has done so here. 11 U.S.C. § 1123(a)(4).

*Indus., Inc.*, 792 F.2d at 1152, courts have interpreted the "same treatment" requirement to mean that all claimants in a class must have "the same opportunity" for recovery. *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008); *see also In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990) (concluding that a plan that "subjects all members of the same class to the same process for claim payment" is "sufficient to satisfy the requirements of Section 1123(a)(4)"). For example, the United States Court of Appeals for the Second Circuit has held that "[a]sbestos health claimants would receive the 'same treatment' if they all were permitted to present their claims to a jury and were all paid whatever amounts the jury awarded, until funds were no longer available." *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992), *opinion modified on rehearing*, 993 F.2d 7 (2d Cir. 1993). What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims. *See id.* ("Without question, the 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money.")

Courts are also in agreement that § 1123(a)(4) "does not require precise equality, only approximate equality." *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007); *see also In re Multiut Corp.*, 449 B.R. 323, 334 (Bankr. N.D. Ill. 2011) (same). Certain procedural differences, such as a "delay in receipt of distributions" for some claims, "do[] not alone constitute unequal treatment." *In re New Power Co.*, 438 F.3d 1113, 1122-23 (11th Cir. 2006); *see also In re Multiut*, 449 B.R. at 337 (same). In fact, § 524(g) "clearly envisions that asbestos claims will be paid periodically as they accrue and as they are allowed," since it

requires courts to ensure that there will be sufficient funds available for both future demands and present claims to receive similar treatment. *In re W. Asbestos Co.*, 313 B.R. 832, 842-43 (Bankr. N.D. Cal. 2003). Therefore, differences in the timing of distributions and other procedural variations that have a legitimate basis do not generally violate § 1123(a)(4) unless they produce a substantive difference in a claimant's opportunity to recover. *See In re New Power Co.*, 438 F.3d at 1122-23 (concluding that a plan provision did not violate § 1123(a)(4) in part because it was "procedural rather than substantive"); *cf. In re Dow Corning Corp.*, 280 F.3d 648, 660 (6th Cir. 2002) (holding that a difference in the procedural protections offered to certain claimants violated § 1123(a)(4) because some claimants were "accorded far more effective recovery rights" than others).

Under that standard, none of the provisions of the TDPs that Montana and the Crown complain of amounts to disparate treatment of creditors. Montana and the Crown first take issue with a provision that allows indirect claims to be considered "presumptively valid" only if, among other things, "the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant." (Montana Opening Br. at 47 (quoting J.A. at 200326) (internal quotation marks omitted).) They say that such a requirement may provide no payout for indirect claims, and is therefore discriminatory. But the only indirect claims that will not be paid based on that provision are those for which Grace has no underlying liability. As the District Court rightly said, there is no "legal authority that requires a debtor to reimburse third parties for wrongs for which the debtor is not responsible," and thus a bar on such recovery cannot be

36

said to constitute disparate treatment. *In re W.R. Grace & Co.*, 475 B.R. at 136.

Montana and the Crown next complain that the "first-in, first-out" mechanism for processing and paying claims discriminates against indirect claims. Citing testimony from the future claimants' representative that "there is a possibility" that the trust may have insufficient funds to pay future claims, they argue that, because claims for indemnification and contribution depend on another judgment first being obtained, their claims will likely be brought later than direct asbestos claims and thus will be less likely to obtain recovery. (Montana Opening Br. at 51 (quoting J.A. at 201664A) (internal quotation marks omitted).) They say that the only fair method for resolving claims against the trust is "for no distributions to be made until all" indemnification and contribution claims have arisen and been asserted. (*Id.* at 52.)

There are significant problems with that argument. First, although there may be a "possibility" that the trust will have insufficient funds to compensate future claimants, the Joint Plan endeavors to make that scenario as unlikely as possible. To that end, it funds the personal injury trust with the amount agreed to by the PI Committee and the future claimants' representative, it limits recoveries using the "Payment Percentage" (which is specifically designed to ensure that present and future claimants receive equivalent amounts), and it allows the Payment Percentage to be modified as needed to permit future recoveries.[24] Second, the

---

[24] As discussed earlier, *see supra* Section I.B, the "Payment Percentage" limits each claimant's recovery to a certain percentage of the liquidated value of his or her claim,

37

"first-in, first-out" payment process is a common feature of § 524(g) trusts, *see In re Federal-Mogul*, 684 F.3d at 360 n.12, and it treats all claims identically, resolving both direct and indirect claims in the order that they are received. Although it may be true that indirect claims will generally recover later under that process because they require the additional step of a judgment being entered against the claimant, the "delayed receipt of distributions to members of a class whose claims remain disputed does not, in and of itself, violate § 1123(a)(4)." *In re New Power Co.*, 438 F.3d at 1122. Finally, it would be wholly unreasonable to require asbestos victims – many of whom have already waited through twelve years of bankruptcy – to continue to wait indefinitely until all indirect claims accrue before they can recover from the trust. *Cf. In re W. Asbestos Co.*, 313 B.R. at 842 ("It is not necessary to make liquidated claims wait for payment until all disputed and unliquidated claims have been resolved."). Rather, by requiring courts to ensure that future demands will be treated fairly, § 524(g) specifically acknowledges that some claims against a trust may recover earlier than others. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V) (requiring that the court ensure that the trust will "operate through mechanisms … that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner"). We therefore agree with the District Court that the "first-in, first-out" mechanism does not violate § 1123(a)(4) or § 524(g).

---

in order to ensure that funds will be available for future claims.

Montana and the Crown also assert that the TDPs are discriminatory because they impose additional restrictions on indirect claims. Specifically, the complaints are that indirect claimants cannot recover attorneys' fees; that, in order to have a presumptively valid claim, an indirect claimant must secure a release of liability against the trust from the direct claimant; and that personal injury claims are limited by the "maximum value" provision of the TDPs. The District Court properly rejected the argument that any of those features make the TDPs unfair. Montana and the Crown have not demonstrated a right to attorneys' fees under their local tort regimes, and there is therefore no reason why they should expect to recover attorneys' fees from the trust. There is also nothing discriminatory about requiring an indirect claimant to obtain a release from the direct claimant whose claims provide the basis for seeking indemnification or contribution. That requirement has the legitimate objective of ensuring that an indirect claimant has satisfied a liability of the debtors, and it would not make sense to extend it to direct claims. In any event, the release provision does not limit a claimant's opportunity for recovery, as indirect claimants who are unable to obtain a release can still pursue their claims through the individual review process.[25] As for the "maximum value"

---

[25] The release of liability is only required for indirect claimants seeking expedited review of their claims. The TDPs expressly state that, "[i]f an Indirect Claimant cannot meet the presumptive requirements" necessary for expedited review, "including the requirement that the Indirect Claimant provide the [personal injury] [t]rust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the [personal injury] [t]rust review the … [c]laim individually." (J.A. at 200326.)

provision, that requirement applies with equal force to direct and indirect claims, and therefore does not result in disparate treatment of claims.

Finally, the Crown independently argues that the TDPs are discriminatory both because Canadian property damage claimants will allegedly receive inferior recovery to U.S. property damage claimants, and because the Crown cannot qualify for "extraordinary claim" treatment. The first of those contentions seems to be based on the amount allocated to the Canadian ZAI property damage claims fund, which is significantly less than the amount being allocated for U.S. property damage claims. But, as the District Court correctly noted, Canadian and U.S. property damage claimants are classified in separate classes, operate under separate tort regimes, and reached separate settlement agreements. *See In re W.R. Grace & Co.*, 475 B.R. at 138-39. There is therefore no reason to expect that they would receive the same dollar amount in recovery, and, more importantly, § 1123(a)(4) does not demand that they receive equal treatment, as it requires only that a plan "provide the same treatment for each claim or interest *of a particular class*." 11 U.S.C. § 1123(a)(4) (emphasis added). Moreover, it is unclear whether the Crown's assertion that Canadian claimants will receive less than their U.S. counterparts is even factually accurate, as the Crown provides no information on the estimated number of Canadian property damage claims, so there is no way to conclude that the available funds are unduly limited.

As for the "extraordinary claim" provision, it is designed to provide a remedy for certain individuals harmed by Grace who have "little likelihood of a substantial recovery elsewhere." (J.A. at 200323.) The Crown is therefore correct

40

that the provision treats certain claims differently than others, but it does so based on the claimant's particular factual situation, in much the same way that the expedited review process treats claims differently based on the particular disease at issue. The Crown does not contest that such substantive distinctions among claims are valid bases for potential differences in the amount of recovery, nor does it argue that the individualized review process will value its claims at less than they would be worth under the tort system. Therefore, it has not shown that the "extraordinary claim" provision unfairly limits its opportunity for recovery.

In sum, the District Court rightly determined that the Joint Plan satisfies the equal treatment provisions of § 1123(a)(4) and § 524(g). Although there may, at the margins, be some differences in recovery for direct and indirect claims, those differences do not amount to disparate treatment of creditors.

C.        *"Fair and Equitable" to Future Claimants*

Montana's and the Crown's final contention is that the Joint Plan violates the "fair and equitable" provision of § 524(g). That provision requires that, before confirming a plan involving a § 524(g) trust, a court must determine that the proposed channeling injunction is "fair and equitable with respect to the persons that might subsequently assert … demands" against the trust "in light of the benefits provided … to such trust on behalf of [the] debtor." 11 U.S.C. § 524(g)(4)(B)(ii).[26] In other words, the provision requires a

---

[26] Although it uses similar language, the § 524(g) "fair and equitable" provision is separate from the "fair and

41

reviewing court to consider whether, given the funds available in a trust, it is "fair and equitable" to channel future demands to that trust.

Although no court of appeals has yet interpreted what "fair and equitable" means in that context, other courts seem to agree that one way to evaluate the equities is to consider the amount being contributed to the trust in comparison to the liability exposure of the protected parties. *See, e.g.*, *In re Plant Insulation Co.*, 485 B.R. 203, 227 (N.D. Cal. 2012) ("[T]he analysis appropriately focuses on the relationship between the contributions of protected entities to the Trust, and the benefits received by the same under the terms of the channeling injunction."); *In re Congoleum Corp.*, 362 B.R. 167, 180 (Bankr. D.N.J. 2007) ("A review of the case law suggests that finding that an injunction is fair and equitable is closely tied to the value being contributed to the plan."). Given the substantial benefit provided by the channeling injunction, courts have held that the protected parties' contribution to the trust must be sufficient to justify that extraordinary form of relief. *See In re Quigley Co.*, 437 B.R. at 133; *In re Plant Insulation Co.*, 485 B.R. at 227 (considering whether the protected parties provided the trust

_____

equitable" provision of 11 U.S.C. § 1129(b), which provides that the court can confirm a plan over the objection of an impaired and dissenting class of creditors if it is "fair and equitable … with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Because Montana and the Crown are in classes that overwhelmingly accepted Grace's Joint Plan, they do not challenge plan confirmation under § 1129(b), and it is not at issue in this appeal.

42

"with sufficient benefits to justify the injunctive relief provided to them, from the perspective of future asbestos injury claimants"). Under that standard, channeling injunctions have generally been considered "fair and equitable" to future claimants when the trust contribution that will be available to those claimants bears some relationship to the estimated value to the debtor of enjoining their claims. *In re Quigley Co.*, 437 B.R. at 140 (denying plan confirmation because future demand holders would receive only about $147 million, whereas the value to the debtor of enjoining their claims was $613 million); *see also In re G-I Holdings Inc.*, 420 B.R. 216, 276 (D.N.J. 2009) (concluding that the "substantial contributions provided" to the trust made it fair to future claimants).

Montana and the Crown do not suggest that the amount being contributed to the personal injury and property damage trusts is out of sensible proportion to the liability exposure of the protected parties.[27] Rather, they contend that

_____

[27] Because Montana and the Crown do not take issue with the size of the trust contribution, we need not determine in this case when an imbalance between the liability exposure and the amount being contributed to a trust prevents an injunction from being "fair and equitable" under § 524(g). We note, however, that the trust contribution does not have to be equal to the projected liability in order for the injunction to be fair to future claimants. Although the statutory language at issue focuses on the funds available to pay future claims, § 524(g) does not require that those claims be paid in full. Rather, it requires that future claims be paid "in substantially the same manner" as present claims. 11 U.S.C. § 524(g)(2)(B)(ii)(V). In many cases, the trust may be funded

43

the TDPs are "unfair and inequitable" because they "lack certainty regarding the amount of distributions and the procedure for distributions" (Montana Opening Br. at 56), and because the Trust Advisory Committee includes "attorneys for underlying asbestos claimholders," which they say is unfair to indirect claimants (*id.* at 57). We are unconvinced that those allegations are even relevant to the question of whether the channeling injunction is fair and equitable under § 524(g). As Grace points out, § 524(g)(4)(B)(ii) "is not a catch-all provision" for objecting to plan provisions (Grace Br. at 78); rather, it specifically addresses whether it is fair to enjoin future claims against the debtor in light of the amount being contributed to the trust. But even if Montana's and the Crown's allegations of

---

in an amount that, as here, only allows present and future claimants to recover a portion of the value of their claims. *See Federal-Mogul*, 684 F.3d at 360 n.12 ("[F]ew trusts pay the full value of submitted claims; current payment percentages range widely, but the median is 25%, with most trusts paying between ten and forty-six percent of a claim's liquidated value."). But that alone does not mean that the injunction is unfair or inequitable, since, without such a limitation, the debtor may be forced to liquidate and be unable to pay future claims at all. For that reason, courts look for a relationship between the protected parties' contribution to the trust and the benefit they are receiving from the injunction, and do not require the trust contribution to be equal to the estimated value of future claims. We leave for another day the question of how to determine whether the benefit of an injunction outweighs the value committed to the trust to a degree that channeling future claims would be unfair to future claimants.

unfairness were relevant to the statutory inquiry, they are baseless. Although they complain that the TDPs do not precisely determine the amount of future recoveries, that uncertainty is unavoidable, as it is impossible to calculate precisely how many future demands will be brought or how much those claimants will be entitled to recover. One cannot even have a § 524(g) trust unless "the actual amounts, numbers, and timing of such future demands cannot be determined." 11 U.S.C. § 524(g)(2)(B)(ii)(II). As for their complaint regarding the Trust Advisory Committee members, that committee exercises only limited control over trust distributions, and Montana and the Crown have pointed to no evidence suggesting that the committee has or will engage in improper conduct. There therefore was no error in the District Court's determination that the channeling injunction is fair and equitable to future claimants under § 524(g).

### III.    Conclusion

For the foregoing reasons, we conclude that the District Court correctly affirmed the Bankruptcy Court's order overruling the objections of Montana and the Crown to Grace's Joint Plan, and we will affirm the Court's order to that effect.