[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 3, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-15492

_____

D. C. Docket Nos.
03-00105-CV-JTC-3
02-10835 BKC-W

IN RE:

THE NEW POWER COMPANY,  ET AL.,

Debtor.

----------------------------------------------------

ENRON CORP.,

Plaintiff-Appellant,

versus

THE NEW POWER COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(February 3, 2006)**

Before BIRCH, WILSON and COX, Circuit Judges.

PER CURIAM:

Plaintiff-appellant, Enron Corporation ("Enron") appeals the district court's affirmance of the bankruptcy court's confirmation of the Second Amended Plan submitted by defendant-appellees, The New Power Company, et al. (collectively "New Power") in their Chapter 11 reorganization. This appeal requires us to consider whether certain modifications to New Power's proposed plan were material and adverse to Enron's interests and whether a provision allowing for interim distributions to certain interest holders violates 11 U.S.C. § 1123(a)(4) of the Bankruptcy Code. We AFFIRM.

## I. BACKGROUND

This appeal arises from consolidated bankruptcy proceedings for three debtors: The New Power Company ("Operating Company"), New Power Holdings, Inc. ("Holdings"); and TNPC Holdings, Inc. ("TNPC"). Our review of the record reveals that a completely independent statement of the facts would not be useful. Thus, we largely adopt the district court's statement of the facts, quoting freely therefrom and supplementing it as necessary.

In June 2002, the three New Power debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code. The debtors are liquidating, rather than

2

reorganizing. This has made possible a plan providing for payment of all creditors in full with interest as well as substantial distributions to equity.[1] Enron held an unimpaired Class 1 secured claim of $98 million and impaired Class 9 equity interests comprising approximately forty-four percent of Holdings' outstanding common stock. In November 2002, pursuant to a settlement agreement approved by the bankruptcy court, New Power paid Enron $28 million plus interest in partial satisfaction of Enron's secured claim. Enron applied $70 million that it held as collateral to the remainder of the secured claim. Thus, Enron's only remaining interest in New Power is an equity interest, which may be satisfied from any cash remaining after New Power's senior creditors are paid.

At a mid-December 2002 hearing, over Enron's objections, the bankruptcy court granted a motion filed by the United States Trustee ("Trustee") to appoint an examiner to investigate certain claims and interests, including those of Enron. The disclosure statement for New Power's First Amended Chapter 11 Plan ("First Amended Plan"), submitted soon after that hearing, described the bankruptcy court's intention to appoint an examiner and noted that the examiner would be

---

[1]New Power's First and Second Amended Chapter 11 Plans both define eleven separate classes: Class 1 - New Power Secured Claims, Class 2 - New Power Unsecured Claims, Class 3 - New Power Intercompany Claim, Class 4 - New Power Stock, Class 5 - TNPC Intercompany Claim, Class 6 - TNPC Stock, Class 7 - Holdings Unsecured Claim, Class 8 - Securities Claims, Class 9 - Holdings Common Stock, Class 10 - Holdings Options, Class 11 - Holdings Warrants. The claims and interests included in Classes 1, 2, 4, and 6 are deemed not to be impaired.

authorized, inter alia, "to investigate, file a report and take other appropriate actions with respect to . . . [w]hether any claim asserted by any of the Enron Parties should be recharacterized as equity." R-Exh.3-530 at 21-22. Based on this disclosure statement, Enron voted its Class 9 equity interests in favor of the First Amended Plan. Its unimpaired Class 1 claim had already been paid in full with interest, so that claim afforded Enron no vote. The bankruptcy court scheduled a confirmation hearing on the First Amended Plan for 12 February 2003.

In mid-January 2003, the bankruptcy court issued its formal written order appointing an examiner.[2] In that order, the court specified that the examiner should file his initial report by 5 February, seven days before the scheduled confirmation hearing. Because the actual examiner was not specified until 17 January, New Power filed a motion on 3 February 2003 to extend the deadline for the initial report to 19 February, seven days after the scheduled hearing. Enron objected on the grounds that Enron's claims and interests had already been reviewed multiple times, including by Enron's bankruptcy court in New York, and thus did not merit the extra delay and expense of further review. Enron did not argue that the examiner's powers did not extend beyond the date of plan confirmation. See R-

---

[2]As the bankruptcy court pointed out in its order denying Enron's motion for reconsideration, all parties, including Enron, submitted proposed appointment orders and filed statements in support thereof. R-Exh.1-931 at 6 n.5. Thus, Enron may not argue that it was unaware of issues concerning the timing and scope of the examiner's investigation.

Exh.2-637 at 7-9. On 14 February the court granted the motion extending the deadline to 19 February.

On 11 February, New Power filed declarations certifying that all impaired classes had voted to accept the First Amended Plan. The same day, in response to objections from another New Power equity interest holder, Riverside LLC, New Power filed a notice of modification of the First Amended Plan. On 12 February, it filed its Second Amended Chapter 11 Plan ("Second Amended Plan"). At the confirmation hearing, held that same day, Enron objected to this second plan on the grounds that, if its secured Class 1 claim were recharacterized as a Class 9 equity interest, it would then be impaired and Enron should have the right to vote before plan confirmation. See R-Exh.7 at 47. Nevertheless, the court orally confirmed the Second Amended Plan as to the Operating Company at the 12 February hearing.[3] Id. at 75-76.

Enron filed written objections to the confirmation as to the Operating Company on 27 February 2003. The objections center on the plan's inclusion of the following new provisions:

---

[3]A review of the transcript of this hearing indicates that the parties likely concluded that because Enron's Class 1 claim against the Operating Company had not yet been reclassified, and because if it were reclassified, it would be as equity in Holdings, any vote Enron might then have would concern confirmation of the plan as to Holdings leaving no barrier to confirmation of the plan as to the Operating Company (at least based on the only objections Enron made at that hearing). R-Exh.7 at 47-48, 70-71.

5.20. <u>Interim Distributions to Interests</u>. In the event that Holdings determines that it is practicable to make a distribution to holders of Allowed Interests prior to the Termination Date, it shall file its proposed procedure with the Bankruptcy Court and apply to the Bankruptcy Court for authorization to make such distribution, whereupon the Bankruptcy Court shall schedule a hearing on such application on notice to the United States Trustee and such other parties in interest as the Bankruptcy Court may direct. In the event any other party in interest determines that it is practicable to make a distribution to holders of Allowed Interests prior to the Termination Date, it shall deliver its proposed procedure to Holdings. In the event that Holdings does not accept such procedure, such party in interest may apply to the Bankruptcy Court for an order directing Holdings to make such a distribution, whereupon the Bankruptcy Court shall schedule a hearing on such application on notice to Holdings, the United States Trustee and such other parties in interest as the Bankruptcy Court may direct . . . .

12.1 <u>Examiner Matters</u>. Nothing contained in the Plan or the Confirmation Order is intended to, nor shall it be deemed to, limit the powers of the Examiner as set forth in the Examiner Order, which order shall remain in full force and effect after the Confirmation Order is entered and the Plan is confirmed. Without in any way limiting the generality of the foregoing, no Claim or Interest that is subject to investigation by the Examiner shall be Allowed without (a) the written consent of the Examiner and the Debtors or (b) a Final Order of the Bankruptcy Court.

R-Exh.2-653 at 21-22, 27-28. New Power did not file a new disclosure statement with the Second Amended Plan, and no further vote was taken.

The bankruptcy court confirmed the Second Amended Plan as to the Operating Company in a written order on 28 February 2003 and denied Enron's subsequent motion to reconsider the confirmation. In confirming this plan, the court deemed Enron's vote in favor of the First Amended Plan a vote in favor of

the Second Amended Plan pursuant to Federal Rule of Bankruptcy Procedure 3019. The court later confirmed the Second Amended Plan as to the two holding companies as well. Upon each confirmation, the respective New Power entities commenced distributions to their creditors and interest holders in accordance with the plan.

Enron appealed the bankruptcy court's confirmations of the Second Amended Plan as to all three New Power entities to the district court, arguing that it had voted for the First Amended Plan based on an understanding it had gleaned from New Power's disclosure statement that the plan limited the examiner's investigatory authority to the pre-confirmation period. According to Enron, the Second Amended Plan, by the addition of § 12.1, removed this temporal limitation at the last minute and allowed the examiner to continue his investigation and potentially to seek recharacterization of Enron's already fully paid secured claim post-confirmation. Enron argued that this plan modification materially and adversely affected Enron's interest, and thus, that Enron was statutorily entitled to another disclosure statement and to re-vote its equity interests before confirmation of the Second Amended Plan.

In essence, Enron argued that confirmation of the First Amended Plan would have brought finality to Enron's claims and interest in New Power, whereas

confirmation of the Second Amended Plan rendered them uncertain. Enron further

argued that the new § 5.20 violates the Bankruptcy Code's non-discrimination

requirement because it allows interim distributions to other Class 9 equity interest

holders while Enron must await completion of the examiner's investigation before

receiving distributions. After a de novo review of the record in light of these

arguments, the district court affirmed the bankruptcy court's confirmation of the

plan.

On appeal to us, Enron again argues that (1) the bankruptcy court lacked the

statutory authority to confirm the Second Amended Plan because the modifications

were material and adverse with respect to Enron's claims and interests; and (2) the

modifications violate the equal treatment required by the Bankruptcy Code with

respect to members of the same class of creditors.

## II. DISCUSSION

In the bankruptcy context, we sit "as a 'second court of review' and thus

'examine[] independently the factual and legal determinations of the bankruptcy

court,'" employing the same standards of review as the district court. In re Optical

Techs., Inc., 425 F.3d 1294, 1299-1300 (11th Cir. 2005) (quoting In re Issac

Leaseco, Inc., 389 F.3d 1205, 1209 (11th Cir. 2004). We review legal conclusions

by either the bankruptcy court or the district court de novo and the bankruptcy

court's findings of fact for clear error. In re Fin. Federated Title & Trust, Inc., 309 F.3d 1325, 1328-29 (11th Cir. 2002).

A. Material and Adverse Modifications

Enron first argues that the bankruptcy court lacked the statutory authority to confirm the Second Amended Plan because the modifications were material and adverse with respect to Enron's interests. A determination of materiality "is a mixed question of law and fact, and is, therefore, reviewed de novo." See United States v. Miranda, 348 F.3d 1322, 1334 n.15 (11th Cir. 2003) (per curiam). An adversity determination is similarly a mixed question of law and fact, and we will review it de novo as well.

The Bankruptcy Code requires that every holder of a claim or interest receive a court-approved written disclosure statement containing "adequate information" about a proposed plan before its vote on that plan may be solicited. 11 U.S.C. § 1126(b)(2). Even after the vote, a plan proponent may modify a plan before confirmation as long as the plan still satisfies all requirements concerning plan contents and the classification of claims and interests. 11 U.S.C. §§ 1127, 1122, 1123. After notice and a hearing, the bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way

that claim or interest holder is treated.  Id. § 1127(d);  Fed. R. Bankr. P. 3019; see also In re Am. Solar King Corp., 90 B.R. 808, 825 (Bankr. W.D. Tex. 1988).  If it does, the claim or interest holder is entitled to a new disclosure statement and another vote.  Solar King, 90 B.R. at 823.

The adverse effects Enron alleges it suffers by virtue of the Second Amended Plan include: (1) an extension of the examiner's investigation and any resulting recharacterization action in relation to Enron's secured claim beyond the end of the preconfirmation period which, Enron argues, serves to disturb its certainty regarding its claims and interests; (2) a redefinition of the plan term "Allowed" which destroys a previous presumption that Enron's claims and interests were allowed; and (3) the addition of an interim distributions provision, which, Enron argues, will jeopardize its own potential distributions or at least cause it to receive them later than other members of Class 9.  In each case, as an initial matter, we consider whether there was any material and adverse modification from the First Amended Plan.  We then review for clear error the bankruptcy court's factual determination that the disclosure statement submitted in connection with the First Amended Plan provided "adequate information" for purposes of the Second Amended Plan.

For the purposes of a plan's disclosure statement, "'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). It is presumed that such an investor will have the "ability to obtain such information from sources other than the disclosure required by this section as holders of claims or interests in such class generally have." Id. § 1125(a)(2)(c).

1. Examiner's Powers

Despite the assurances by both New Power and the Creditors' Committee that neither intended to challenge Enron's claims or interests, other equity holders and the Trustee resurrected the question of their validity in December 2002 after it became clear that all creditors' claims would be paid in full with interest but well before any plan was confirmed.[4] Enron participated in the briefing concerning Riverside's motion for the appointment of an equity committee and the Trustee's

_____

[4]Even the Creditors' Committee conceded it never examined the Enron claims as fully as it might have had New Power not had the ability to pay all creditors in full with interest: "[A]lthough the Creditors' Committee may have looked at the validity of the claims and the liens of the Enron creditors, we don't know that anybody has undertaken any kind of review as to whether there's a possibility that the facts and the law would support recharacterizing the Enron creditor's claims as equity in the case." R-Exh.8 at 24.

11

motion for the appointment of an examiner. One of the specific purposes for each of these motions was to ensure further investigation of Enron's claims and interests. Enron was also represented at the 17 December hearing at which the court denied the motion for appointment of an equity committee and granted the motion for appointment of an examiner. No temporal limitations on the scope of the examiner's investigatory powers were imposed at this hearing.

Further, in the disclosure statement filed in connection with the First Amended Plan, New Power described the bankruptcy court's intention to appoint an examiner "to investigate, file a report and take other appropriate actions" regarding whether any of Enron's claims should be recharacterized. R-Exh.3-530 at 21-22. As noted by the district court, the disclosure statement contained no mention of a time limitation on either the examiner's investigation or the commencement of any recharacterization action. At the time of the hearing, Enron did not object to the lack of this specification in the disclosure statement. On the basis of the disclosure statement, it voted its equity interests in favor of the First Amended Plan.

Finally, all evidence as to the intentions of the bankruptcy court indicates that the court meant the examiner to pursue his duties without reference to the date of plan confirmation, except to the extent the examiner was originally directed to

file an initial report prior to the confirmation hearing. In granting the motion for appointment of an examiner, the court explained that it would "ascertain [the duration of the investigation] at a later time." R-Exh.8 at 59. In the order appointing the examiner, the court still made no temporal limitations, requiring only that the examiner file a report with the court prior to initiating any action.[5] R-Exh.3-569 at 3. Then, two days *after* it had confirmed the plan as to the Operating Company, the court extended the deadline for filing of the examiner's initial report, clearly allowing his activities and investigation to continue post-confirmation. Enron participated in all related hearings and briefing.

Accordingly, we agree with the district court that the examiner's powers were not in any way limited by "time constraints in the First Amended Plan." R2-21 at 10. The record fully supports the contention that all decisions related to the temporal and substantive scope of the examiner's investigation were made by the

---

[5]Further, "we have said that 'we are reluctant to disturb a bankruptcy court's judgment interpreting its own earlier order,' and that the 'bankruptcy judge who has presided over a case from its inception is in the best position to clarify any apparent inconsistencies in the court's rulings.'" In re Optical Technologies, Inc., 425 F.3d 1294, 1300 (11th Cir. 2005) (quoting In re Ranch House of Orange-Brevard, Inc., 773 F.2d 1166, 1168 (11th Cir.1985)).

In reference to its examiner orders and the scope of the examiner's investigatory powers, the bankruptcy court explained: "While the Examiner Order originally called for the Examiner to file a report on February 5 and to present that report at the confirmation hearing, the Order in no way indicated that the Examiner's investigation would be concluded at that time. Throughout these proceedings, the Court has indicated that, while it did not wish to unnecessarily waste time and money on fruitless investigations or 'fishing expeditions,' it would allow a full investigation into the concerns raised by Riverside as to the validity of the Enron Lien and Enron's equity interests." R-Exh.1-931 at 15.

bankruptcy court independently of any plan confirmation.[6]   Thus, we find that the

addition of § 12.1 made absolutely no change to the treatment of Enron's claims or

interests.[7]

---

[6]Enron argues that it ought to be able to rely on the plain language of the First Amended Plan for its understanding of the scope of the examiner's powers.  This argument is unavailing in light of our conclusion that those powers derived not from any plan, but from the court's examiner orders.  Even if it were to rely on the plan language, we observe that § 9.1 of both the First and Second Amended Plans reserves for the bankruptcy court post-confirmation jurisdiction

> over the Debtors, the Estates and the Chapter 11 Cases until the Chapter 11 cases are closed, for the following purposes: . . (a) to hear and determine any and all pending or future proceedings regarding the allowance, disallowance or subordination of Claims or Interests; . . . (c) to hear and determine all pending or future controversies, suits, and disputes that may arise under the Plan, including controversies arising in connection with the interpretation or construction of the Plan or any documents intended to implement the provisions of the Plan; . . . (g) to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan and to implement and effectuate the Plan; (h) to enforce all orders, judgments, injunctions, and rulings entered in connection with the Chapter 11 Cases; . . . [and] (i) to hear and determine all applications, adversary proceedings, disputes, controversies and contested matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Cases, including matters related to any Claim or Avoidance Action to be pursued for the benefit of the Debtors or their Estates, whether such Claim or Avoidance Action is filed prior to or after the Confirmation Date.

R-Exh.2-653 at 23-25; R-Exh.3-536 at 22-23.  The First Amended Plan thereby afforded the bankruptcy court the jurisdiction to clarify, post-confirmation, the continued force of the pre-confirmation examiner order.

[7]At oral argument, Enron challenged the continued force of the court's examiner order by asserting that plan confirmation essentially nullifies all previous court orders in a case unless those orders are specifically incorporated by the plan.  This concept appears also to have motivated both Riverside and the examiner to ask that §§ 5.20 and 12.1 be added in the Second Amended Plan to clarify the continuation of the authority granted the examiner in the court's examiner order.  The examiner, in so requesting at the 12 February hearing, remarked that "the [Eleventh] Circuit law of court is of great significance to the entry of a confirmation order" and, citing In re Justice Oaks II, Ltd., 898 F.2d 1544 (11th Cir. 1990), expressed a desire to avoid

Additionally, we find that the bankruptcy court's determination that the disclosure statement produced in connection with the First Amended Plan provided Enron with "adequate information" as to the risk to which its already paid Class 1 claim and its Class 9 equity interests were subject was not clearly erroneous. The statement disclosed the examiner's pending appointment as well as the precise subject matter of his investigation. Even if that were not sufficient, Enron was an active participant in the hearings and briefing related both to the decision to appoint an examiner and the determination of the timing and scope of his investigations. Enron clearly had access to adequate information regarding the

"any effect of preclusion or . . . stopping the examiner from doing what the examiner was directed to do." R-Exh.7 at 53.

Although we did observe that confirmation of a bankruptcy plan binds all parties to the proceeding and has the same preclusive effect as a final judgment on the merits, see Justice Oaks II, 898 F.2d at 1549-50, the examiner is not a party in interest, and the confirmation does not have the same preclusive effect on the court, particularly when jurisdiction is reserved in the confirmed plan, as in this case. Further, the authorities later submitted by Enron, support the proposition of preclusion only under particular circumstances not present here. In re Allen, 300 F.3d 1055, 1059 (9th Cir. 2002), addressed the continued force of a lift stay order beyond plan confirmation. That case is easily distinguished from this in that a lift stay order has statutory temporal limitations imposed upon it by virtue of the temporal limitations governing the automatic stay, whereas the examiner order here is not subject to any statutory temporal limitation. In In re Berryman Prods., Inc., 183 B.R. 463 (N.D. Tex. 1995) the party seeking to bring an avoidance action on behalf of the debtor's estate failed, prior to plan confirmation, to secure a court order permitting it to do so. The court found, in that case, that a post-confirmation order allowing the action would constitute an amendment of the plan. Id. at 467. This case may be distinguished in two ways. First, prior to confirmation, the court had granted the motion for appointment of an examiner, issued its first examiner order, and approved the appointment of a particular examiner. Second, the party empowered to bring actions, the examiner, acts not in his own interest but as a fiduciary appointed by the court. For both these reasons, the examiner's power would not have been disturbed by confirmation of the First Amended Plan, and the clarifications in the Second Amended Plan do not expand the examiner's powers.

15

treatment of its claims and interests whether they ultimately fell into Class 1 or Class 9.  The bankruptcy court's determination is more than "plausible in light of the record viewed in its entirety."  See Holton v. City of Thomasville School Dist., 425 F.3d 1325, 1351 (11th Cir. 2005).  There is no clear error.

2. Redefinition of the Term "Allowed"

Enron also argues that it has been adversely affected by what it alleges to be the Plan's effective redefinition of the term "Allowed" in § 1.4 of the Second Amended Plan.  Enron argues that the addition of the words "subject to the provisions of paragraph 12.1 hereof," to the definition effectively destroys the presumption that its Class 9 and 11 claims will be allowed.  Because this is the first time Enron has made this argument, it is not properly before us.  See, e.g., Sterling Fin. Inv. Group, Inc. v. Hammer, 393 F.3d 1223, 1226 (11th Cir. 2004) ("The law in our circuit is clear that arguments not presented in the district court will not be considered for the first time on appeal.").

To the extent that this argument is not based on the addition to the definition of "Allowed" but on the effect of § 12.1 on Enron's claims and interests, it is similar to the argument we addressed in part II.A.1.  Enron's argument that the status of its claims was somehow altered from the First to the Second Amended Plan is unavailing.  Part V.B of the disclosure statement filed in connection with

16

the First Amended Plan provides that a claim or interest will fall within "a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class." R-Exh.3-530 at 27. Part IV.L. explains the court's appointment of an examiner and the subject matter of his investigation. Id. at 21-22. As the bankruptcy court noted, these two sections, read together, put Enron on notice that its claims would be investigated by the examiner and that its secured claim in Operating Company could be recharacterized as an equity interest in Holdings, and, in turn, classified within Class 9. R-Exh.1-931 at 13. Again, because the examiner's powers come not from the Second Amended Plan, but from the bankruptcy court's examiner order, the Second Amended Plan, including the addition to the definition of "Allowed," only more clearly laid out what Enron could expect concerning its claims and interests than did the First Amended Plan.[8]

_____

[8]Enron emphasizes the loss of its certainty regarding disposition of its claims and interests in light of the post-confirmation powers of the examiner and the consequent status of its claims and interests. We agree with the bankruptcy court, however, that the statutory framework of the Bankruptcy Code does not appear to contemplate unconfirmability of a plan in the face of only the possibility that a particular claim will later be reclassified or disallowed. Both the Code and the Rules provide for confirmation prior to the resolution of all issues regarding the claims asserted by or against the debtor. See In re Associated Vintage Group, Inc., 283 B.R. 549, 560 (B.A.P. 9th Cir. 2002) ("A Plan confirmed early in the case does not ordinarily definitively resolve claims."). The Code and the Rules anticipate the continued resolution of claims objections and avoidance actions after confirmation. Specifically, a plan may provide for the "settlement or adjustment" or the "retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose" of any claim or interest belonging to the debtor or to the estate. 11 U.S.C. § 1123(b)(3). This serves "to make possible the formulation and consummation of a plan before completion of the investigation and prosecution of causes of action such as those for previous insider misconduct and mismanagement of the debtor" and to further the "purpose of preserving all assets of the estate while facilitating

17

The Second Amended Plan itself did nothing to change the status of those claims or interests and § 12.1 has no material or adverse effect thereon. The disclosure statement filed in connection with the First Amended Plan provides adequate information as to Enron's claims and interests.

### 3. Interim Distribution Provision

Enron also argues that it is adversely affected by the addition of § 5.20 which provides for interim distributions to equity holders with allowed interests. Enron did not make this particular argument before the bankruptcy court or the district court. To the extent that this is different from the argument concerning unequal treatment violative of § 1123(a)(4), we will not consider it for the first time on appeal.[9] See Sterling Fin. Inv. Group, 393 F.3d at 1226.

### B. Equal-Treatment Requirement of Bankruptcy Code

Enron also challenges new § 5.20 on the ground that the interim distributions provision violates the Code's equal treatment requirement. A plan must "provide the same treatment for each claim or interest of a particular class."

---

confirmation of a plan." In re Kroh Bros. Dev. Co., 100 B.R. 487, 494 (Bankr. W.D. Mo. 1989). Particularly in light of Enron's pre-vote awareness of the renewed investigation of its claims and interests, the Code does not guarantee Enron the pre-confirmation certainty it seeks.

[9]We observe that if treatment of Enron's interests under § 5.20 is not unequal to the treatment of other equity holders' interests, it may hardly be deemed adverse.

11 U.S.C. § 1123(a)(4). We review this question de novo. See, e.g., In re Dow Corning Corp., 255 B.R. 445, 501 (Bankr. E.D. Mich. 2000).

Enron argues that § 5.20 allows Class 9 equity interest holders that are not subject to the examiner's investigation to seek immediate distribution and that this provision unfairly discriminates against Enron, which must wait for either the consent of the examiner and New Power or an order of the bankruptcy court before its claim will be allowed and any distribution made, thereby "creating a significant risk that Enron will not be paid its pro-rata share." Appellant's Br. at 35. Section 5.20 does not award interim distributions; it only provides a procedure for their award under the supervision of the bankruptcy court. Either Holdings or any interest holder wishing to effect an interim distribution pursuant to § 5.20 must "file its proposed procedure [for making such a distribution] with the Bankruptcy Court and apply to the Bankruptcy Court for authorization." R-Exh.2-653 at 21-22. The bankruptcy court must then hold a hearing on notice to the Trustee and other parties in interest. Id. The bankruptcy court is thus in a position to ensure compliance with § 1123(a)(4) in the event of any proposed distribution.

Further, delayed receipt of distributions to members of a class whose claims remain disputed does not, in and of itself, violate § 1123(a)(4). See Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc., 914 F.2d 810, 814 n.7 ("the

19

requirement of 11 U.S.C. § 1123(a)(4) that all claims or interest of the same class receive the same 'treatment' does not appear to be violated by the escrowing of one class member's payments pending the outcome of disputes over the claim's validity"); In re Western Asbestos Co., 313 B.R. 832, 842 (Bankr. N.D. Cal. 2003) ("It is not necessary to make liquidated claims wait for payment until all unliquidated claims [in that class] have been resolved."). Accordingly, because this section is procedural rather than substantive and because a delay in receipt of distributions for disputed claims does not alone constitute unequal treatment, § 5.20 does not violate § 1123(a)(4).

### III. CONCLUSION

Enron has appealed the district court's affirmance of the bankruptcy court's approval of New Power's Second Amended Plan. Because we find that the modifications made were not material and adverse, and therefore that the bankruptcy court could properly deem Enron's vote in favor of a prior plan to be a vote in favor of the modified plan, and because we find that the interim distribution provision does not violate the equal treatment provision of the Bankruptcy Code, we AFFIRM.