Harlin DeWayne Hale, United States Bankruptcy Judge
In this case, the Court is called on to consider whether the proposed modification of a plan prior to confirmation will materially and adversely change the treatment of a creditor's claim in order to determine whether the creditor's prior acceptance of the plan should be deemed an acceptance of the modified plan pursuant to Bankruptcy Rule 3019(a). The unique trajectory of this case, however, has greatly complicated what would normally be a straightforward inquiry.
I. Background
The above-captioned debtors (the "Debtors") were licensed operators of over forty skilled nursing facilities across seven states (the "Facilities").[1] The Debtors occupied almost all of these facilities as lessees renting from certain affiliates and subsidiaries of Omega Healthcare Investors, Inc., a publicly traded real estate investment trust (collectively with its affiliates and subsidiaries, "Omega") pursuant to three master leases (the "Master Leases").[2]
As discussed in the Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 19] (the "First Day Declaration"), the performance of the Facilities was negatively impacted by industry headwinds, regulatory actions at certain Facilities, and an inefficient geographic footprint in certain regions in the United States. Ultimately, the Debtors' rent obligations to Omega under the Master Leases were significantly higher than the Debtors' operating income could support. By the Debtors' estimates, as of the time they filed for *450 bankruptcy, they owed approximately $14 million to Sterling National Bank ("Sterling") under a senior secured credit facility, $52 million to Omega as rent due under the Master Leases, $15 million to Omega under a working capital loan,[3] and $67 million to unsecured trade creditors.
Pre-Bankruptcy Planning
Prior to filing for bankruptcy, the Debtors explored various strategic alternatives relating to their existing debt obligations and eventually struck a deal with Omega. The deal provided the Debtors with a path to a successful reorganization but did not guarantee that the Debtors would get there. The Debtors would file for bankruptcy, and Omega would provide with them with debtor-in-possession financing (the "DIP Facility"). During the bankruptcy, Omega would agree to the deemed severability of the Master Leases so that the Debtors could reject the leases for roughly half of the Facilities (the "Transfer Portfolio"), allowing Omega to lease those Facilities to new operators. Omega would also agree to the deemed recharacterization of the leases for the remaining Facilities as secured loans (the "Restructuring Portfolio") so that the Debtors could then own those Facilities and put them through a marketing and sale process. The proceeds from that sale process, along with the Debtors' cash on hand, would then be used to fund a plan of reorganization. The agreed-upon transactions were intended to "allow the Debtors to resolve their legacy and contingent liabilities in a comprehensive manner, remove the litigation overhang, transfer certain underperforming Facilities to new operators in an efficient and structured manner, and above all, provide certainty regarding the Debtors' future operations for all of the Debtors' stakeholders including, most importantly, the Debtors' residents, employees, and vendors." First Day Declaration at ¶ 59.
This plan was memorialized in the Restructuring Support Agreement (as subsequently amended, the "RSA")[4] entered into by the Debtors, Omega, and SC-GA 2018 Partners, LLC (the "Plan Sponsor" or the "Purchaser") on March 6, 2018. Among other things, the RSA contained (i) a commitment from the parties to support, pursue, and consummate the contemplated transactions for the Transfer Portfolio and the Restructuring Portfolio, (ii) a commitment from the Debtors to adhere to numerous milestones in the bankruptcy cases, (iii) an outline for the marketing and bidding process to be pursued in the bankruptcy cases, (iv) an agreement by Omega to reduce the Debtors' rent obligations during the bankruptcy cases, (v) a commitment by Omega to provide the Debtors with the DIP Facility and the ability to use cash collateral, (vi) a commitment by the Plan Sponsor to essentially act as a stalking horse bidder for the Restructuring Portfolio, (vii) a commitment from the Debtors to support the approval of releases contemplated in the RSA, and (viii) a commitment by the parties to support a plan of reorganization. The RSA was extensive and included, among other form documents, a form plan of reorganization.
Implementing the Pre-Bankruptcy Plans
On March 6, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing these cases (the "Chapter 11 Cases"). Early in the Chapter 11 Cases, the Debtors obtained approval of a *451 settlement agreement with Omega (as amended by the order approving it, the "9019 Settlement").[5] Pursuant to the 9019 Settlement, the Master Leases were deemed severable, and the leases with respect to the Transfer Portfolio were deemed rejected. The leases and agreements with respect to the Restructuring Portfolio were, subject to confirmation of the Debtors' proposed plan of reorganization, deemed recharacterized as secured financings. Omega provided the DIP Facility, accepted reduced rent from the Debtors, and waived its right to receive any distribution on account of its unsecured deficiency claim. The Debtors also sought and obtained approval of the DIP Facility, which, among other things, provided working capital for the Debtors and paid off the entirety of the senior secured debt owed to Sterling.[6] A few weeks after the 9019 Settlement was approved and the Final DIP Order was entered, the Court entered the Order Authorizing the Debtors' Assumption of the Restructuring Support Agreement [Docket No. 506].
On June 22, 2018, the Debtors filed the Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 615] (the "Original Plan"). Relevant to the matter currently before the Court, under the Original Plan, the Restructuring Portfolio was going to be sold to the Plan Sponsor in exchange for the Plan Sponsor Consideration[7] pursuant to the Stock Purchase Agreement. Omega's DIP Facility Claims would be paid in full on or before the Effective Date in cash from the Accounts Receivable. Omega's Class 1 Claim (the "Omega Secured Claim") would receive (i) the Plan Sponsor Consideration and (ii) any remaining Distribution Trust Assets, other than the General Unsecured Claims Cash Amount, following payment in cash of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Tax Claims, Allowed Other Secured Claims, and the Tort Claims Cash Amount. Omega's Class 4 Claim (the "Omega Unsecured Claim") was not entitled to receive any distribution because Omega waived its right to receive any such distribution in the Omega Compromise. Omega submitted ballots for the Omega Secured Claim and the Omega Unsecured Claim to accept the Original Plan on June 26, 2018.
Disputes Arise Between the Debtors and Omega
On June 26, 2018, the Debtors, Omega, the Committee, and the Plan Sponsor attended mediation in an attempt to reach a global resolution on a number of objections the Committee raised against the Original Plan. During these negotiations with the Committee, Omega appears to have become aware of a plan interpretation issue that caused a rift between Omega and the Debtors. Unfortunately, the disagreement turned out to be significant, and it resulted in the Debtors filing the Debtors' Expedited Motion for an Order Interpreting Certain Provisions of the Third Amended Chapter 11 Plan [Docket No. 680] (the "Plan Interpretation Motion").
*452 Through the Plan Interpretation Motion, the Debtors asked the Court to resolve a dispute between the Debtors and Omega regarding which of the different sources of funding for the Original Plan could be used to pay particular claims. Specifically, the Court was asked to consider whether the Original Plan allowed for the Plan Sponsor Consideration[8] to be used to pay Allowed Administrative and Priority Claims and the DIP Facility Claims before flowing through to the Omega Secured Claim. This dispute was significant because the Debtors did not have enough cash on hand to pay the DIP Facility Claims, so if the Debtors were not permitted to use the Plan Sponsor Consideration to pay the DIP Facility Claims (as the Debtors argued they were), the Original Plan would be unconfirmable because it would not satisfy the feasibility requirement. In the event the Court did not agree with the Debtors' interpretation of the Original Plan, the Debtors proposed modifying the Original Plan to make the Plan Sponsor Consideration available to pay claims other than just the Omega Secured Claim, which, according to the Debtors, would make "the parties' original intent even more plain." The Debtors asked the Court to find that this proposed modification would not impact Omega's treatment under the Plan so that Omega's acceptance of the Plan would carry over to the modified version.
In an oral ruling delivered on July 9, 2018 (the "July 9 Ruling"), the Court agreed with Omega's interpretation of the Original Plan that the Plan Sponsor Consideration could only be used to pay the Omega Secured Claim and then went on to find that the Debtors' alternative proposal of making the Plan Sponsor Consideration available to pay additional claims would have an adverse effect on treatment of the Omega Secured Claim.
Following the July 9 Ruling, the prospects for reaching a consensual resolution of these Chapter 11 Cases continued to dim. On July 20, 2018, Omega sent a letter to the Debtors and the Plan Sponsor purporting to terminate the RSA on the basis that the confirmation order was not entered by July 19, 2018. On July 23, 2018, Omega sent a letter to the Debtors conveying a Termination Declaration under paragraph 28 of the Final DIP Order and a Carve-Out Trigger Notice under paragraph 16(a)(iii) of the Final DIP Order.
On July 27, 2018, the Debtors filed the Debtors' Motion for Reconsideration of July 9, 2018 Ruling [Docket No. 786] (the "Reconsideration Motion"), seeking reconsideration of the July 9 Ruling solely with respect to whether the Debtors' proposed plan modifications would adversely impact Omega's originally proposed treatment. In ruling on the Reconsideration Motion on September 7, 2018, the Court held that the July 9 Ruling would be without prejudice to the Debtors' right to file a motion to modify the Original Plan and have an evidentiary hearing on whether the proposed modification satisfies the requirements of the Bankruptcy Code and Bankruptcy Rules.[9] Before the Debtors actually filed a motion seeking approval of a plan modification, however, they took several other *453 steps that effectively changed the landscape of the Chapter 11 Cases.
Plotting a New Course for the Chapter 11 Cases
Recharacterization
On July 27, 2018, the Debtors commenced an adversary proceeding against certain Omega entities seeking recharacterization of two of the three Master Leases.[10] On the same day, the Debtors filed a motion for summary judgment.[11] At a hearing held on September 17, 2018, the parties presented an agreed judgment to the Court, and the Court entered the Agreed Judgment and Partial Order of Dismissal [Adv. Proc. No. 18-3237, Docket No. 23] (the "Recharacterization Judgment") on September 25, 2018. The Recharacterization Judgment provides that the South East Region Master Lease and the Indiana Region Master Lease are each recharacterized as, and deemed to be, a financing agreement rather than a lease. As a result, the Debtors have (or had as of the Petition Date) legal and equitable title in both the Restructuring Portfolio and the Transfer Portfolio. In paragraph 4 of the Recharacterization Judgment, the parties agreed that the Debtors would reserve their rights to ask the "Court [to] determine the value of the Transfer Portfolio Assets as of the applicable dates of their transfer and apply such value against the Omega Entities' claims in the Bankruptcy Cases."
Omega had previously filed a proof of claim asserting a prepetition claim of approximately $425.3 million. Following Omega's consent to the Recharacterization Judgment and the removal of the section 502(b)(6) cap on Omega's claim for rejection damages, Omega filed its amended proof of claim in the amount of approximately $579.4 million.
Valuation of the Transfer Portfolio
On August 13, 2018, the Debtors filed a motion[12] asking the Court to value the Transfer Portfolio and to apply that value against the DIP Facility Claims. While the Debtors and Omega were not able to entirely resolve the Valuation Motion by consent, they did stipulate that the value of the Transfer Portfolio is $190 million. At the hearing on the remaining relief requested in the Valuation Motion, Omega took the position that the value of the Transfer Portfolio should be credited against Omega's claims, but not against the DIP Facility Claims. The Court accepted that position, and on October 2, 2018, the Court entered an order to that effect [Docket No. 1023] (the "Valuation Order"). While the Valuation Order did not grant the Debtors' request to credit the value of the Transfer Portfolio against the DIP Facility Claims, it memorialized the stipulated value of the Transfer Portfolio and expressly permitted the Debtors to seek a credit against the Omega Secured Claim under a plan of reorganization.
Sale of the Remaining Facilities
On August 13, 2018, the Debtors filed a motion[13] seeking approval of a sale *454 through an asset purchase agreement (the "Sale") to the Purchaser on the same economic terms as those previously contemplated under the Stock Purchase Agreement and the Original Plan. On October 4, 2018, the Court approved the Sale Motion [Docket No. 1041] (the "Sale Order"). The Sale Order provides that "[u]pon Closing, any cash proceeds of the Sale shall be paid over to the Debtors to be held in escrow pending the effective date of a chapter 11 plan or further order of the Court, at which time, such proceeds will be payable pursuant to the terms thereof or as otherwise ordered by this Court." Sale Order at ¶ 29. The closing of the Sale is expected to occur in December 2018.
The 3019 Motion and the Amended Plan
On October 9, 2018, the Debtors filed the Debtors' Modified Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 1053] (as modified,[14] the "Amended Plan") along with the Debtors' Motion (A) to Approve Plan Modifications Under Bankruptcy Rule 3019 and (B) for Related Relief [Docket No. 1055] (the "3019 Motion").
The Amended Plan makes several changes to the Original Plan to account for significant events that have taken place in these Chapter 11 Cases. Perhaps most importantly, the Amended Plan needed to reflect the recharacterization of two of the Master Leases, the approval of the sale of the Restructuring Portfolio to the Purchaser through an asset purchase agreement, and the recent election of Omega to no longer contribute the Laurel Baye facilities to the Debtors for inclusion in the Restructuring Portfolio.
The Amended Plan also alters the treatment of Omega's claims. Under the Amended Plan, Omega's DIP Facility Claims would be paid in full, in cash, on or before the Effective Date, but there is no qualification regarding where that cash comes from. The implication is that some of the Plan Sponsor Consideration would be used to pay the DIP Facility Claims and other administrative and priority claims. Thus, under the Amended Plan, the Omega Secured Claim would receive the remaining Distribution Trust Assets and the remaining Plan Sponsor Consideration. The Amended Plan supplements the treatment for the Omega Secured Claim, however, by adding (1) interim rent, which refers to payments made by the Debtors to Omega following the Petition Date on account of partial rent due and owing under the Master Leases prior to the Recharacterization Judgment and (2) the Transfer Portfolio. There was no change in the treatment of the Omega Unsecured Claim, which is still not entitled to receive any distribution, but the language about this being due to the Omega Compromise has been removed.
Through the 3019 Motion, the Debtors have asked this Court to find that pursuant to Federal Rule of Bankruptcy Procedure 3019(a), Omega should be deemed to accept the Amended Plan. The Court held a hearing on the 3019 Motion on October 24, 2018 and took the matter under advisement.[15]
*455 II. Applicable Legal Standard
Under Bankruptcy Rule 3019(a), a modification to a plan proposed before confirmation but after balloting is completed will be deemed accepted by creditors who accepted the pre-modification version of the plan if the proposed modification "does not adversely change the treatment of the claim of any creditor ... who has not accepted in writing the modification." Courts have applied a "materiality" standard when interpreting whether a proposed modification adversely changes the treatment of a creditor's claim, such that a creditor's prior acceptance of a plan will be deemed an acceptance of the modified plan if the modification does not "materially and adversely change" the treatment of the creditor's claim. See, e.g. , In re American Solar King Corp. , 90 B.R. 808, 825 (Bankr. W.D. Tex. 1988) (discussing the legislative history for Bankruptcy Rule 3019 and adopting a materiality standard); Enron Corp. v. New Power Co. (In re New Power Co.) , 438 F.3d 1113,1117-18 (11th Cir. 2006) (applying a materiality standard to Bankruptcy Rule 3019 and citing to American Solar King ); In re SCC Kyle Partners, Ltd. , Case No. 12-11978, 2013 WL 2903453, at *33-34, 2013 Bankr. LEXIS 2439, at *97-98 (Bankr. W.D. Tex. June 14, 2013) (same); In re Cypresswood Land Partners, I , 409 B.R. 396, 440-41 (Bankr. S.D. Tex. 2009) (same).
III. Legal Analysis
Omega's claims receive three different types of treatment under the Amended Plan. Under the Amended Plan, the Omega DIP Facility Claims will be paid in full, in cash, on the Effective Date, just as they were required to be paid under the Original Plan. The Omega Unsecured Claim will receive no distribution, just as it would have under the Original Plan. The most pressing question before the Court then is whether the Amended Plan will materially and adversely change the treatment of the Omega Secured Claim under the Original Plan.
The treatment of the Omega Secured Claim under the Amended Plan is different from its treatment under the Original Plan in several respects. Under the Amended Plan, the evidence presented by the Debtors is that Omega will only receive $143 million in cash[16] from the Plan Sponsor Consideration[17] but would also receive an additional $10.5 million from other cash on hand, $22.8 million from Accounts Receivable collected through the Distribution Trust, $4.8 million already paid to Omega on account of "interim rent," $1.6 million from the sale of the Memphis Headquarters, and $190 million on account of the Transfer Portfolio. Notably, if the Court accepts the Debtors' estimates for the remaining Plan Sponsor Consideration, the Accounts Receivable to be collected through the Distribution Trust, and the interim rent, it only amounts to $182.7 million being distributed to Omega on account of the Omega Secured Claim. This represents a shortfall of just over $12 million from the $195 million in cash from the Plan Sponsor Consideration Omega was to receive on account of the Omega Secured *456 Claim under the Original Plan. If the Court includes the $190 million in value for the Transfer Portfolio in this analysis, however, the result is that the treatment for the Omega Secured Claim is plainly better under the Amended Plan than it was under the Original Plan. So the more narrow question for the Court is whether the value of the Transfer Portfolio can be included in the treatment of the Omega Secured Claim in the Amended Plan. Omega raises a number of arguments for why it should not be, and the Court will attempt to address those arguments in a logical order.
As a threshold matter, Omega claims that the leases for the Facilities in the Transfer Portfolio were not recharacterized. If that were the case, Omega would only have received the Debtors' deemed rejection of those leases pursuant to the 9019 Settlement and there would be no additional value to distribute through the Amended Plan. For this argument, Omega appears to rely on the notion that under the 9019 Settlement, upon transitioning each Facility in the Transfer Portfolio, the Master Lease was terminated as to that Facility. Omega's logic continues that if the lease for a Facility terminated before entry of the Recharacterization Judgment, nothing remained to be recharacterized. The Court believes this is an inaccurate statement of the law regarding recharacterization.
Recharacterization is not affected by the transfer of some of the Facilities to new operators prior to entry of the Recharacterization Judgment because recharacterization is effective as of the date of the execution of the subject agreements. See, e.g. , Am. President Lines v. Lykes Bros. SS Co. (In re Lykes Bros. S.S. Co.) , 216 B.R. 856, 865 (Bankr. M.D. Fla. 1996) (determining that the recharacterization of a sale-lease back agreement as a financing arrangement applied from the beginning of the transaction); see also In re ES2 Sports & Leisure, LLC , 519 B.R. 476, 479-80 (Bankr. M.D.N.C. 2014) (analyzing a purported lessor's request for an administrative claim for use of leased equipment and noting that if the equipment lease was a disguised secured transaction, then title to the equipment transferred to the debtor upon delivery); Mason v. Heller Fin. Leasing (In re JII Liquidating, LLC) , 341 B.R. 256, 273 (Bankr. N.D. Ill. 2006) ("Events occurring after the execution of an agreement do not alter the character of the transaction. ... Rather, the characterization of a contract applies ab initio , that is, from the beginning of the transaction."). Once the Court entered the Recharacterization Judgment, it was determined that the Facilities in the Transfer Portfolio were never leased property under the Master Leases but were in fact owned by the Debtors all along until such time as they were transferred to Omega or Omega's designees.
Omega continues this argument that the leases for the Facilities in the Transfer Portfolio were not recharacterized by asserting that the Facilities in the Transfer Portfolio were excluded from the Recharacterization Judgment, as reflected in the Debtors' acknowledgment that they do not currently hold or claim any ownership interest in the Transfer Portfolio. Paragraph 4 of the Recharacterization Judgment states:
To the extent any properties or associated assets included in the Transfer Portfolio have already (or will be) transitioned to new operators designated by certain Omega Entity landlords as of the date of this Agreed Judgment (the "Transfer Portfolio Assets"), the Debtors hereby acknowledge, stipulate, and agree that they do not currently hold or claim any ownership interest in the *457 Transfer Portfolio Assets; provided , however that the Debtors and the Committee reserve all rights and remedies in connection with the Transfer Portfolio Assets, including, without limitation, to seek to have the Court determine the value of the Transfer Portfolio Assets as of the applicable dates of their transfer and apply such value against the Omega Entities' claims in the Bankruptcy Cases.
This portion of the Recharacterization Judgment is fully consistent with the Debtors' claims that they are the former owners of the Facilities in the Transfer Portfolio but are now willing to limit themselves to a monetary judgment and a credit against Omega's claim to avoid a situation where they would disrupt operations of the transferred Facilities by trying to claw them back.
In addition, Omega's interpretation of the Recharacterization Judgment is contradicted by paragraph 2 of the Recharacterization Judgment, which plainly states that the parties agreed that "each of the Master Leases in these Bankruptcy Cases is characterized as and deemed to be a financing agreement rather than a 'lease' ...." There is a footnote after "Master Leases," which clarifies that any capitalized term not otherwise defined in the Recharacterization Judgment has the meaning given to such term in the Debtors' brief in support of the motion for summary judgment, or, if not defined therein, in the Debtors' complaint. The term "Master Leases" is defined in the brief in support of the Debtors' motion for summary judgment to be the Debtors' "leases with Defendants in connection with approximately 38 facilities [ ] governed by two Master Leases (together, the 'Master Leases')."[18] This is plainly a reference to the South East Region Master Lease and the Indiana Region Master Lease. If that were not enough, paragraph 3 of the Recharacterization Judgment includes a footnote stating:
A list of the Facilities that are subject to the Master Leases and this Agreed Judgment (broken down into the Restructuring Portfolio and the Transfer Portfolio) is attached hereto as Exhibit D , and is the "Recharacterized Portfolio ."
Exhibit D lists twenty-three Facilities from the Transfer Portfolio as Facilities included in the Recharacterized Portfolio subject to the Recharacterization Judgment. In sum, the Court finds that the leases for the Facilities in the Transfer Portfolio were recharacterized as a result of the Recharacterization Judgment.
Omega next claims that the value of the Transfer Portfolio cannot be included in the treatment for the Omega Secured Claim because it has already been given to Omega pursuant to the 9019 Settlement. As Omega puts it, the Debtors are trying to "spend this coin a second time." The error in this argument is that the Debtors are dealing with a significantly different coin than existed at the time of the 9019 Settlement. Under the 9019 Settlement, the leases associated with the Transfer Portfolio were being deemed rejected. This is a far cry from the reality now, which is that collateral worth $190 million was returned to a secured creditor. The potential of a subsequent recharacterization action actually appears to have been acknowledged and preserved in paragraph 6 of the order approving the 9019 Settlement, which states:
*458 In addition, notwithstanding the relief granted by this Order, the Objecting Parties and any other party in interest shall retain (if they have standing to pursue such claims or matters) the right to bring any and all claims against the Omega Parties as to the Transfer Portfolio and the nature, extent, amount, status, or validity of any claim or any other rights of the Omega Parties as to the Transfer Portfolio.
That is exactly what happened. A party brought a claim attacking the nature of Omega's rights as to the Transfer Portfolio. Such a preservation of rights would be meaningless if Omega could simply claim that the Debtors received full value for the now-recharacterized Transfer Portfolio in the 9019 Settlement.
The Court is somewhat surprised that Omega is now arguing that the Debtors have already received credit for the Transfer Portfolio and are entitled to nothing more since Omega did not raise this argument in the context of the Valuation Motion when the Debtors were seeking to value the Transfer Portfolio and to credit that value against the Omega DIP Facility Claims. Instead, at that time, Omega took the contrary position that the Transfer Portfolio was collateral securing Omega's prepetition claims and that the Debtors were indeed entitled to a credit against that claim for the value of the Transfer Portfolio. Omega took this position both in their briefing[19] and at the hearing.[20] In its oral ruling on the Valuation Motion, the Court essentially agreed with counsel for Omega, stating that "[w]hile Omega undoubtedly accepted property, rather than cash, in payment of some of its claims, there has been no showing that Omega waived the cash payment requirement for the DIP Obligations rather than for its prepetition claims." The Court based its ruling on its understanding that while a credit for the return of collateral must be given, it would be more appropriate in the context of a plan.
It is difficult to fathom how the Debtors could not be entitled to a credit for the value of collateral returned to a secured creditor. As the Debtors note in their briefing, if Omega is correct and there should not be any additional credit against Omega' claims for the value of the Transfer Portfolio, it means that Omega could have stipulated to receiving a return of $1 billion in collateral during the Chapter 11 Cases but would still be entitled to payment on its undiminished secured claim. In sum, the Court finds that the Debtors have not yet received credit for the value of the recharacterized Transfer Portfolio and such value must be credited against Omega's claims.
Having found that the Debtors are entitled to a credit against Omega's claims for *459 the value of the Transfer Portfolio, the Court must also determine which claims the value should be credited against. In the Valuation Order, the Court already determined that the value of the Transfer Portfolio may not be credited against the DIP Facility Claims. This leaves only the Omega Secured Claim or the Omega Unsecured Claim. The Debtors argue that such a credit must be applied to the secured portion of Omega's claims and provide case law in support of their argument. See First Fed. Bank of California v. Weinstein (In re Weinstein) , 227 B.R. 284, 296-97 (9th Cir. BAP 1998) (discussing the proper application of postpetition, preconfirmation payments made to a secured creditor); Confederation Life Ins. Co. v. Beau Rivage Ltd. , 126 B.R. 632, 640 (N.D. Ga. 1991) ("If payments are made to an undersecured creditor, they must be allowed to reduce the allowed secured claim of the creditor. Otherwise the payments would be treated as interest payments or use value, in direct contravention of Timbers and § 506."). The Court agrees with the Debtors that a credit for the value of the Transfer Portfolio must be applied to the Omega Secured Claim.
The Court's determination that the Debtors are allowed to include the value of the Transfer Portfolio in the treatment provided for the Omega Secured Claim in the Amended Plan makes it unnecessary for the Court to address several other issues that were raised. For instance, Omega challenges the way in which the Debtors calculated the relative treatment of the Omega Secured Claim under the Original Plan and the Amended Plan because Omega does not believe the Debtors have properly accounted for the interim rent payments, the payment of professionals' fees, postpetition tort claims, or payment of rental obligations for Facilities that were not recharacterized. Some of these issues that Omega identifies are legal in nature, and some of these issues just relate to the inherent difficulty in forecasting and the fact that Omega will now bear the risk of unfavorable deviations from the forecasts. In total, Omega believes the Debtors have overstated the projected treatment of the Omega Secured Claim by roughly $30 million, leaving Omega with an overall reduction in the Omega Secured Claim recovery under the Amended Plan of more than $54 million. Given the provision of an additional $190 million in value from the Transfer Portfolio, which Omega excludes from its analysis, these amounts do not change the Court's conclusion that the treatment of the Omega Secured Claim is better under the Amended Plan than it was under the Original Plan.
Based on these findings so far, the Court is able to determine that the Amended Plan will not materially and adversely change the treatment of the Omega Secured Claim under the Original Plan. There are, however, still some additional issues raised by Omega that the Court must address. Omega notes that it waived its right to distributions on account of the Omega Unsecured Claim under the Omega Compromise, but the Omega Compromise has now been removed from the Amended Plan. Omega seems to claim that the deficiency waiver has now also been removed, but the deficiency waiver is still in section V.T of the Amended Plan and is also still compelled by Omega's settlement with the Official Committee of Unsecured Creditors, which the Court found was an enforceable settlement in its Order Granting Official Committee of Unsecured Creditors' Emergency Motion to Enforce Settlement [Docket No. 1137]. In removing the Omega Compromise from the Amended Plan, Omega also suggested that either (a) the Debtors have not entirely removed all features of the Omega Compromise or the 9019 Settlement from the Amended Plan *460 that needed to be removed or (b) the removal may have had unintended consequences for other portions of the Amended Plan. The Court is not aware of any outstanding issues in this vein, but if there are, Omega may raise them at confirmation.
The final issue the Court must address is whether this is an appropriate use of Bankruptcy Rule 3019. Omega argues that Bankruptcy Rule 3019 is intended for technical or ministerial plan modifications to save the time of re-soliciting. In this instance, Omega asserts that Bankruptcy Rule 3019 is being used as an offensive weapon to cram down the claims of an objecting creditor. Nevertheless, nothing in the plain language of Bankruptcy Rule 3019 limits its application to technical or non-substantive modifications, and Omega was not able to point the Court to any cases in which a plan modification proposed under Bankruptcy Rule 3019(a) was rejected just because it was material when it was not adverse. Rather, the cases cited by Omega focused on the materiality requirement of Bankruptcy Rule 3019 after finding adversity. See, e.g. , In re American Solar King Corp. , 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (finding first that a proposed modification was adverse and then considering whether the adversity was material). The Court also notes that Bankruptcy Rule 3019 looks to the adversity of changes in treatment of claims rather than the materiality of changes to a plan. This leaves open the possibility that a plan modification under Bankruptcy Rule 3019(a) can be substantial as long as it does not adversely and materially change the treatment of a creditor's claims. The Debtors rely on Enron Corp. v. New Power Co. (In re New Power Co.) for the proposition that a change in the circumstances of a case does not necessarily make Bankruptcy Rule 3019 inapplicable. 438 F.3d 1113 (11th Cir. 2006). In this case, the proposed modification is being used to account for events that took place in the Chapter 11 Cases, but outside of the plan. The modification is necessary to reflect the new realities of the case, which include the Recharacterization Judgment and the Valuation Order, which drastically changed the Chapter 11 Cases and were entered with Omega's consent. Under this set of facts, the Court believes it is appropriate to evaluate the Debtors' proposed plan modification under Bankruptcy Rule 3019(a).
IV. Conclusion
The Transfer Portfolio was recharacterized, and the Debtors have not yet received consideration for transferring their ownership of the Transfer Portfolio to Omega. It is appropriate to credit the value of the Transfer Portfolio against the Omega Secured Claim for which it was collateral, and it is appropriate to provide such credit in the context of treatment of the Omega Secured Claim in a plan of reorganization.
The Debtors have modified a plan that Omega has already voted for. The motion before the Court asks the relatively simple question of whether the modification materially and adversely changes the treatment of Omega's claims under the Original Plan. The Amended Plan treats Omega's claims more favorably than the Original Plan, which Omega voted to accept. Omega is therefore deemed to accept the Amended Plan.
IT IS THEREFORE ORDERED that the 3019 Motion is GRANTED ; and it is further
ORDERED that the Debtors are not required to resolicit the Amended Plan or provide any additional disclosures under section 1125 of the Bankruptcy Code ; and it is further *461 ORDERED that the Amended Plan is deemed accepted by Omega.

The Debtors also managed one additional skilled nursing facility and one of the Debtors provided hospice and palliative care services at certain of the Facilities and other third-party locations.

Despite the fact that the Debtors operated as lessees under the Master Leases, they claimed that some or all of the lease transactions contained in the Master Leases were subject to recharacterization as secured financial transactions under applicable state or federal law.

The Debtors' obligations to Omega under the Master Leases and under the working capital loan were secured.

A copy of the RSA with its amendments is available at Docket No. 331-3.

Order (I) Approving Amended Settlement Agreement, and (II) Granting Related Relief [Docket No. 375].

See Final Order: (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; and (II) Granting Related Relief [Docket No. 376] (the "Final DIP Order").

Capitalized terms used, but not defined herein, have the meaning given to them in the Original Plan.

The Court is using this term as it is defined in the Original Plan but notes that the Plan Sponsor Consideration includes cash received from the Plan Sponsor in consideration for the Restructuring Portfolio.

To avoid any potential confusion, the Court notes that a proposed plan modification was included in the Plan Interpretation Motion, and a different proposed plan modification was referred to in connection with the Reconsideration Motion. Neither of those plan modifications are currently before the Court as the Debtors ultimately chose to seek approval of a different plan modification.

Adversary Proceeding No. 18-3237.

Plaintiffs' Motion for Summary Judgment [Adv. Proc. No. 18-3237, Docket No. 3].

Debtors' Motion for Valuation of Transfer Portfolio and Application of Proceeds to Debtors' Obligations Under Senior Secured Superpriority Debtor-in-Possession Credit Agreement and Working Capital Loan Agreement [Docket No. 824] (the "Valuation Motion").

Debtors' Motion for an Order Authorizing and Approving (A) the Sale of Certain Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Procedures to Assume and Assign Executory Contracts and Unexpired Leases, and (C) Related Relief [Docket No. 828] (the "Sale Motion").

On October 23, 2018, the Debtors filed a Notice of Filing of Additional Modifications to Debtors' Modified Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 1120]. As used herein, the defined term "Amended Plan" refers to the version of the plan filed at docket entry 1053 and modified as set forth in docket entry 1120.

By agreement of the parties, the following exhibits are admitted into evidence: Debtors' Exhibits 7, 8, 11-14, 14A, 15-21, 24, 29, 33, 34, 42, 44, 45, 46, 51, 55, 56, 80, 81, 83, 88, 89, 102, and 103; Omega's Exhibits 3, 5, 8, 10, 15, 18, 26, and 28-31; and Committee's Exhibits 1-11.

The Plan Sponsor Consideration includes $195 million in cash and a $30 million note. Omega will still receive the Plan Sponsor Note, so in attempting to discern the change in the treatment of the Omega Secured Claim, the Court will focus on the cash component.

For simplicity, the Court is analyzing the treatment of the Omega Secured Claim under the Original Plan and the Amended Plan as though Omega had not elected to retain the Laurel Baye properties. Omega's choice to retain the Laurel Baye properties would have the same impact on both plans, so it does not change the Court's analysis.

Plaintiffs' Brief in Support of Motion for Summary Judgment [Adv. Proc. No. 18-3237, Docket No. 4].

Response to Debtors' Motion for Valuation of Transfer Portfolio and Application of Proceeds to Debtor-in-Possession Credit Agreement and Working Capital Loan Agreement [Docket No. 927] at ¶ 2 ("Nor did the Omega Entities expect to receive the value of the Transfer Portfolio without giving due credit against their outstanding claims.... As the Omega Entities have repeatedly explained, that value was originally credited against that portion of their lease rejection damages claim; following recharacterization of the Master Leases, it will be credited against the outstanding balance due under the Master Leases.").

See Hr'g Tr. Sept. 19, 2018 [Docket No. 1001] at pp. 35:18-36:1 ( [Counsel for Omega]: First of all, just to be clear, Your Honor, we're not suggesting that Omega not get credit for the transfer portfolio. I want to be clear about that. We obviously identified it as part of the collateral securing the pre-petition claims. And a value of $190 million would necessarily reduce that asserted claim, to the extent it's allowed, from $578 million by $190 million. So just I want to be clear, we do agree that credit should be given for it, just not on the DIP, for the reasons I'll come to.").